**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ASPEN NETWORKS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. 2:23-CV-00476-RWS-RSP |
| | § | (LEAD CASE) |
| AT&T MOBILITY LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**CLAIM CONSTRUCTION ORDER**

Before the Court is Plaintiff's Opening Claim Construction Brief (Dkt. No. 75) filed by Aspen Networks, Inc. ("Plaintiff" or "Aspen"). Also before the Court is the Defendants' Responsive Claim Construction Brief (Dkt. No. 80) filed by AT&T Mobility LLC ("AT&T"), Cellco Partnership d/b/a Verizon Wireless ("Verizon"), and T-Mobile US, Inc. and T-Mobile USA, Inc. ("T-Mobile") (collectively "Defendants"). Also before the Court is Plaintiff's Reply Claim Construction Brief (Dkt. No. 83) and Defendants' Sur-Reply Brief (Dkt. No. 89).

The Court held a hearing on April 29, 2025. Having considered the parties' briefing along with arguments of counsel, the Court resolves the disputes as ordered herein.

## I. BACKGROUND

Plaintiff alleges infringement of a patent in the field of telecommunications relating to improved handover of VoIP protocols between networks during a voice or video call. The patent is: U.S. Patent No. 8,009,554 ("the '554 Patent" or the "Patent-at-Issue").

The title of the ’554 Patent is “Method for multiple link quality of service for voice and video over internet protocol” and the Abstract states:

> A method for achieving multiple link quality of service for video and voice calls over Internet links, or over IP links running in private networks, is described. This method applies to both the non-mobile domain (alternate paths exist in one place at the same time) as well as the mobile domain (one path is used at any one place at a given time, but the user device roams from place to place). This method can be implemented as either computer software or other digital logic (ASIC or FPGA). Using this invention, voice and video calls can be moved at will from one path to another, as many times as required during a single conversation, without breaking the RTP voice or video payload stream. The benefit is that embodiments of this invention have a significantly higher probability that a call never breaks under various conditions of quality degrade. This includes the case of link and router failures, which are treated as a special case of quality degrade in the context of voice and video.

## II. LEGAL STANDARDS

“‘[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude.’” *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure-Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). “[T]he court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim.” *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*); *aff’g,* 517 U.S. 370, 390 (1996).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent’s claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* “One purpose for examining the specification is to determine if the patentee has limited the scope of the claims.”

*Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.,* 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips,* 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips,* 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the United States Patent and Trademark Office ("PTO") understood the patent. *Phillips*, 415 F.3d at

1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*; *see Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation").

Intrinsic evidence, therefore, is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.,* 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips,* 415 F.3d at 1312). But for claim terms with less-apparent meanings, courts consider " 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean[,] [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.' " *Phillips,* 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116). In those situations, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

However, the intrinsic record may not be sacrificed in favor of extrinsic evidence. According to *Phillips*, reliance on dictionary definitions, for example, at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321.

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910, 134 S. Ct. 2120, 2129 (2014). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id*. The claims "must be precise enough to afford clear notice of what is claimed," but that consideration must be made while accounting for the inherent limitations of language. *Id.* at 908. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III. AGREED TERMS

The parties have reached agreement on the following term and construction as submitted in their Joint Claim Construction Chart Pursuant to P.R. 4-5(d). (Dkt. 87).

| Term | Agreed Construction |
|---|---|
| "stream quality event"<br><br>('554 Patent, claims 2 and 16) | "RTP stream quality drops below or exceeds configured quality thresholds" |

## IV. DISPUTED TERMS

### 1. "a network protocol that operates on top of the internet protocol"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "a network protocol that operates on top of the internet protocol"<br><br>('554 Patent, claims 1 and 15) | Not indefinite. Plain and ordinary meaning | Indefinite |

This term appears in the preamble of claims 1 and 15 of the '554 Patent. The dispute is whether the preamble is limiting and, if so, whether a skilled artisan would be unable to reasonably discern the scope of the claim.

Plaintiff contends the preamble is not limiting because it does not "give life, meaning, and vitality" to claims 1 or 15, which each describes a complete invention without consideration of this term. In addition, Plaintiff states that the meaning of this term is clear to a person of skill in the art, who would understand the reference to protocols operating "on top of" other protocols as describing the general layered framework establishing the interconnectedness of systems and protocols that enable data transmission within a telecommunications network. As support, Plaintiff points to elements in claim 1 that identify certain protocols such as "at least one Network Address Translation (NAT)," "the Real Time Protocol (RTP)," and "Session Initiation Protocol (SIP)" used during transmission, which reside across multiple network layers. As clarified during the hearing, Plaintiff's assertion is that the reference to "the internet protocol" in the disputed term is not identifying a specific network layer; rather, it is a general reference to any network protocol. Thus, Plaintiff contends there is no ambiguity to this term and it is sufficiently definite.

Defendants respond that the claim drafter intended for the preamble to be limiting in this instance because the term "a transmission from a source to a destination in a communications network" provides antecedent basis to terms in the body of the claim. Moreover, Defendants argue that while a skilled artisan would understand the ISO/OSI Reference Model where networks are described in the context of layers, the artisan would not understand how a "network protocol," which references the particular network layer, can operate "on top of the Internet Protocol (IP)," which also references the same network layer. Such an arrangement makes no sense, argue Defendants, because the same layer cannot be described as operating on top of each other. Therefore, Defendants submit this term should be held indefinite.

The Court starts with a review of the claims to begin its analysis. Here, claim 1 is representative, and reads as follows with the disputed term in bold:

> 1. A method of enhancing the reliability of a transmission from a source to a destination in a communications network using **a network protocol that operates on top of the Internet Protocol (IP)**, the method comprising:
>
> transmitting data between a source and destination over a first network path made up of one or more network links where at least one of the network links is to a local area network that is remote from the transmission source; and
>
> switching the transmission from the first network path to one of a plurality of alternative network paths;
>
> wherein said transmission is not disrupted as a result of said switch to the one of a plurality of alternative network paths, said transmission contains audio or video data and at least one Network Address Translation (NAT) is performed on said transmission;
>
> said transmission uses the Real Time Protocol (RTP);
>
> said transmission uses the Session Initiation Protocol (SIP); and
>
> the SIP signaling sequence of the transmission is maintained after said switching from the first network path to the one of a plurality of alternative network paths.

As Plaintiff conceded during oral argument, "a transmission from a source to a destination in a communications network" in the preamble provides antecedent basis to the later recited "the transmission" and "said transmission." Thus, the parties are in agreement on that phrase in the preamble, which is not disputed, as being limiting. However, the parties still dispute whether the ensuing clause is limiting, "using a network protocol that operates on top of the Internet Protocol (IP)," or whether it simply provides descriptive but unnecessary context for the recited "a transmission."

The Court finds that "using a network protocol that operates on top of the Internet Protocol (IP)" is not limiting. The disputed preamble clause does not provide antecedent basis to any term in the body of the claim and is present simply to add additional background to describe "a transmission." This phrase does not appear in the body of the claim and, when read as a whole, the claim still makes complete sense with the clause omitted. Even apart from the preamble, the claim elements offer a fulsome understanding that the claimed method comprises transmitting data between a source and destination over a network using the recited NAT, RTP, and SIP protocols without requiring a description that the transmission use a particular network protocol that operates on a certain network layer, as Defendants contend.

As a pillar of claim drafting, there exists a rebuttable presumption that "[a] preamble does not limit the claims." *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236 (Fed. Cir. 2017) (citation omitted). To overcome the presumption, there must be a showing that the preamble "recites essential structure or steps," or "give life, meaning, and vitality" to the claim as a whole. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citation omitted). As explained, the Court does not find that the disputed term in the preamble recites any

essential structure or steps; nor does it give life, meaning, and vitality to the claim as a whole. Therefore, it is not limiting.

Moreover, even if the entire preamble was found to be limiting, the disputed term would not be rendered indefinite. One of ordinary skill in the art would recognize from the claim language itself, and within the larger written description, that "a network protocol that operates on top of the Internet Protocol (IP)" refers generally to the layered architecture of internet protocols. Claim 1 clearly identifies three such protocols that sit across different network layers so there can be no mistake whether they must be above a certain layer to be "on top." Moreover, the specification explains how the standard transport and session layers of the protocol stack operate on top of the IP stack, and that this knowledge is standard in the telecom industry. For example, the specification notes that "[t]he main standard protocols in use for audio and video over IP networks are the Session Initiation Protocol (SIP), Session Description Protocol (SDP) as defined in [1], [2] respectively, and lastly the Real Time Protocol (RTP) and RTP Control Protocol (RTCP) as defined in [3]." ('554 Patent, 1:19-23.) And these are described as "the standard protocols in use with Voice over Internet Protocol (VoIP), as well as in various video and video-conferencing protocol stacks that run on top of IP." (*Id.*, 1:23-26.) None of the disclosures say that the "IP stack" or "IP" singularly refers to only the network layer protocol. "IP" more reasonably refers to the layered architecture of network protocols generally and "network protocol" refers to the various layers rather than a single particular layer. The Court is convinced that a person well versed in telecommunications standard protocols would not be confused by the phrasing of this term. Notably absent from Defendants' submissions is any expert testimony making such an assertion.

Defendants have not presented a clear and convincing argument or any evidence that one of skill in the art would be unable to reasonably ascertain the scope of this claim. The Court

therefore finds that the disputed term "a network protocol that operates on top of the internet protocol" **is not indefinite and should be given its plain and ordinary meaning.**

**2. "transmission source"**

| Claim term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "transmission source"<br><br>('554 Patent, claims 1 and 15) | Not indefinite. Plain and ordinary meaning. | Indefinite or, alternatively, Plain and Ordinary Meaning (i.e., device that initiates the transmission) |

The issue to be resolved is whether "transmission source" is indefinite for lack of antecedent basis and, if not, whether the dependent claims show that the "transmission source" must be a device.

Plaintiff contends that this term is not indefinite because "the transmission source" is a reference back to the earlier recited "a transmission from a source" and "transmitting data between a source and destination." The term "transmission source" is not a term of art, argues Plaintiff, so the plain language of the term simply identifies the source of a transmission. Thus, Plaintiff submits, there is no question as to antecedent basis just because the claim does not provide explicitly for "a transmission source." Moreover, Plaintiff believes Defendants' alternate construction improperly narrows the term because nothing in the intrinsic evidence suggests that the transmission source must be a device.

Defendants disagree that "the transmission source" refers back to the "sources" appearing earlier in the claims, arguing that this reading would omit the differentiating label "transmission" from the phrase "transmission source." Defendants also assert it would be unclear to a person of skill in the art whether "the transmission source" refers to a transmitting device or merely a location

in the network, which calls for the Court to clarify that this term is referencing a "device that initiates the transmission." Defendants further note that dependent claims 6 and 20 refer back to the methods of claims 1 and 15 "wherein the source device is a mobile device," which shows that the patentee must be identifying the "sources" referred to in claims 1 and 15 as source "devices."

The Court begins its analysis with the claim language. The relevant portions of claim 1, which is representative of claim 15, reads as follows, with the disputed term in bold:

> 1. A method of enhancing the reliability of a transmission from a source to a destination in a communications network using a network protocol that operates on top of the Internet Protocol (IP), the method comprising:
>
> transmitting data between a source and destination over a first network path made up of one or more network links where at least one of the network links is to a local area network that is remote from the **transmission source**; and
>
> . . .

Dependent claim 6, which is substantively identical to claim 20, reads as follows:

> 6. The method of claim 1 wherein the source device is a mobile device.

As shown, the preamble clearly provides a "method of enhancing the reliability of a transmission from a source to a destination in a communications network." Additionally, the element in which the disputed term appears also provides antecedent basis for this term. A method comprising "***transmitting data between a source and destination*** over a first network path made up of one or more network links where at least one of the network links is to a local area network that is ***remote from the transmission source***" identifies a (i) source of transmission, (ii) destination of transmission, and (iii) the location of the local area network destination being remote from the transmission source. The source of transmission is clearly the same as the transmission source, and Defendants have offered no evidence as to how the two can be confused by one of skill in the art. The Court therefore finds the term "transmission source" to be supported by antecedent basis and is not indefinite.

Furthermore, the language in claim 1 does not limit the "transmission source" to a device. To the contrary, it does not mention a device and only identifies the location of the local area network (destination) as being "remote from the transmission source," which suggests that the transmission source is also a location. The location can be geographically differentiated or simply elsewhere on a network. As is generally the case with dependent claims, claim 6 adds a limitation of "the source device" on top of the limitations present in claim 1, thereby identifying the transmission source as a device. Claim 6 further narrows the source device to a mobile device. The added limitations in the dependent claim indicate that the scope of the independent claim is broader in that it can encompass a device and a mobile device, rather than being limited to them.

Additionally, these are method claims. The relevant element in claim 1 simply requires a transmission of data between a source and a destination, irrespective of what or where that transmission source is so long as it is remote to the local area network at the end of a network link. The step of the method is all that is recited, leaving open the location and source of transmission to the understanding of one skilled in the art.

Defendants have offered no evidence, intrinsic or otherwise, that narrows the meaning of "transmission source" as it contends. Accordingly, the Court declines to find this term indefinite and further rejects Defendants' alternative proposal limiting this term to a "device that initiates the transmission."

The Court therefore finds the claim term "transmission source" **is not indefinite and should be given its plain and ordinary meaning.**

### 3. "SIP signaling sequence of the transmission is maintained"

| Claim term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "SIP signaling sequence of the transmission is maintained"<br><br>('554 Patent, claims 1 and 15) | Not indefinite. Plain and ordinary meaning.<br><br>Alternatively, "SIP signaling sequence, or 'cseq,' numbers are monotonically increased for new transmissions or preserved for retransmissions"<br><br>* Plaintiff has also indicated agreement with the PTAB Construction: "the same rule or paradigm is used to identify that an incoming SIP packet is the next SIP packet in a sequence, regardless of whether that packet is transmitted on the first network path or the one of a plurality of alternative network paths." | Indefinite or, alternatively, "SIP signaling sequence number of the transmission is maintained throughout a dialog with a SIP server" |

The dispute as to this term is whether "the SIP signaling sequence" is indefinite for lack of antecedent basis. And, if not, whether the SIP signaling sequence must be a number that is maintained throughout a dialog with a SIP server.

Plaintiff contends there is no antecedent basis issue because a person of ordinary skill in the art would understand what the "SIP signaling sequence" is in the context of the claim language and specification; thus, it should be given its plain and ordinary meaning. Plaintiff argues that Defendants' narrowed construction impermissibly limits the claims to a preferred embodiment and

further adds language that does not appear in the specification. Thus, to the extent a construction is necessary, Plaintiff proposes an alternative construction that it believes to better align with the patent disclosures. In addition, Plaintiff points to the *Inter Partes* Review (IPR) Decision denying review to say the Patent Trial and Appeal Board (PTAB) had no trouble construing this term even more broadly than the parties' proposals. So as a further alternative, Plaintiff is willing to accept and adopt the PTAB's construction of this term.

Defendants argue indefiniteness because claims 1 and 15 do not recite any "SIP signaling sequence of the transmission" to which "***the*** SIP signaling sequence of the transmission" could be referring, so it lacks proper antecedent basis. Defendants disagree that the written description provides relevant disclosures because (i) the specification discusses a "SIP signaling sequence ***number***," which is worded differently than the claimed "SIP signaling sequence," and (ii) the "SIP signaling sequence number" in the specification is discussed in an entirely different context compared to the "SIP signaling sequence" recited in the claims. Specifically, Defendants note that the claim requires the SIP signaling sequence of the transmission to be maintained ***after*** the switching occurs whereas the described embodiment only discloses a SIP signaling sequence number to be in a dialog between a SIP device and a SIP server ***before*** the transmission is moved from one network link to another, therefore they cannot be the same element. Moreover, Defendants contend that a skilled artisan would not be able to determine the boundaries of this term because there is no evidence that "a transmission" from a "source to a destination" using "SIP" inherently requires a "SIP signaling sequence." Nor that the artisan would know what it means to "maintain" it. For these reasons, Defendants ask the Court to find this term indefinite or, alternatively, limit its meaning to the sole example disclosed in the specification.

The Court's analysis begins with a review of the claim language. Claim 1, which is representative, provides for a step of "switching the transmission from the first network path to one of a plurality of alternative network paths" wherein:

> said transmission uses the Session Initiation Protocol (SIP); and
>
> **the SIP signaling sequence of the transmission is maintained** after said switching from the first network path to the one of a plurality of alternative network paths.

Although the disputed term (in bold) uses the indefinite article "the" and there is no prior reference in this claim to "a SIP signaling sequence," it does not lack antecedent basis. The Court is persuaded that a skilled artisan can easily ascertain that "the SIP signaling sequence of the transmission" refers to a signaling sequence within the "Session Initiation Protocol (SIP)" that is being used with the transmission, as recited in the preceding claim element. In addition, the skilled artisan can reach by implication from the context of the claims, especially when read within the patent as a whole, that maintaining the signaling sequence as part of the recited SIP is done to avoid disruption of the transmission (and enhance its reliability) when it is being switched between a first network path and one of a plurality of alternative network paths. Clearly, if the method requires the SIP signaling sequence of the transmission to be maintained, it implies that the SIP signaling sequence already exists and is being used in the transmission. Accordingly, the term is not indefinite for lack of antecedent basis. *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) ("[A] claim could be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable").

Nonetheless, this term necessitates construction as the parties disagree on its meaning and have submitted several competing proposals. Both Plaintiff's and Defendants' alternative

proposed constructions submitted in briefing are drawn from disclosures in the specification, and specifically from FIG. 4 and its corresponding flowchart description. The two relevant paragraphs of the flowchart description are reproduced below:

| | |
|---|---|
| [160] | The SIP signaling sequence number must be maintained between the SIP device and the server. |
| [210] | The dialog with the SIP server must be completed before the RTP stream can be moved. The state involving the SIP signaling sequence number (often referred to as the 'cseq' value, must be maintained throughout the dialog. For a new 'transaction' this number must monotonically increase; for a re-transmit of an old transaction, it must remain the same. |

As can be seen, both paragraphs mention a "SIP signaling sequence number." This is the only place where this phrase appears in the written description.

The first disagreement as to the meaning of the disputed term is whether a "SIP signaling sequence" is different from a "SIP signaling sequence ***number***." The PTAB decision addressed this issue well by explaining that the specification discloses preferred embodiments, like the use of a SIP signaling sequence number, that inform a person of ordinary skill in the art on what the proper claim scope should be, but that example of a number should not be imported into the claim. Indeed, there is "no indication in the specification that the invention's 'SIP signaling sequence' is limited to the use of numbers." (Dkt. 83-2 at 13.) The Court agrees and further notes that the claim does not recite a "number," leaving open what may constitute a SIP signaling sequence. So, while a numerical limitation should not be imported into the claims, it is used in the specification to inform on the meaning of a SIP signaling sequence using a preferred embodiment of a number.

The second disagreement is whether the ***claims***' use of "SIP signaling sequence" and the ***specification's*** use of "SIP signaling sequence number" are in such different contexts that disclosures of one cannot inform the other. As stated above, the Court does not find these to be different contexts or entirely different terminology discussing unrelated disclosures. Indeed, the

claim provides for a method of "switching the transmission from the first network path to one of a plurality of alternative network paths; wherein . . . ***said transmission uses*** the Session Initiation Protocol (SIP); ***and*** the SIP signaling sequence of the transmission is maintained after said switching . . . ." Clearly, the SIP and, by implication, the SIP signaling sequence, is being used and maintained throughout the switching of network paths. It is not sensibly the case, as Defendants suggest, that the "SIP signaling sequence number" is used prior to switching and a different "SIP signaling sequence" is maintained afterwards. Similarly, FIG. 4 is "a flow chart of the method for achieving quality of service for voice and video over IP using multiple links," which refers to a continuity of quality rather than a single stage of the transition in a piecemeal part of the process. ('554 Patent, 4:26-27.) Even the flowchart and description begins with establishing a SIP session [100] and continues with moving the RTP stream to a new designated WAN link [240] if all checks are affirmative, and then looping back to the SIP session again. (*Id.*, col. 4.) Therefore, the disclosed embodiment is illustrative of the claimed invention and provides context and meaning to the disputed term.

As explained above, the plain language of claim 1 is sufficient to inform a person of skill in the art that a "SIP signaling sequence" is used in transmissions as part of the Session Initiation Protocol and that maintaining it when switching between network paths helps to enhance the reliability of the transmission. The specification provides further guidance by explaining that the state of the SIP signaling sequence must be maintained in order to achieve a certain quality of service for voice and video over IP when using multiple links. The examples provided include using "a SIP signaling sequence number or cseq value," as described in [160] and [210]. ('554 Patent, col. 4.) Or sending the SIP re-invite message to the same SIP server that handled the original SIP Invite, conveying the transport layer port and IP address parameters for the "move"

in appropriately formulated SIP/SDP headers in the re-invite message, or always communicating with the same SIP server that it originally registered with for the entire duration of one call (*Id.*, 7:36-8:3.) Each of these options underscores the importance of using some anchor (the claimed "SIP signaling sequence") to maintain continuity of the transmission when switching between network links.

The PTAB conducted a similar analysis of this term, finding that the "consistent thread" in the specification is that the "'state involving the SIP sequence' is maintained throughout the dialog." (Dkt. 83-2 at 14.) The Board then found that "the state of the SIP signaling sequence as that term is used in the specification refers to the rules (or paradigm) used to identify a collection of SIP signals as a 'SIP signaling sequence,' and in particular the rules used to identify the next SIP packet received as belonging to a sequence of packets previously received." (*Id.*) The PTAB construed this term "to require that the same rule or paradigm is used to identify that an incoming SIP packet is the next SIP packet in a sequence, regardless of whether that packet is transmitted on the first network path or the one of a plurality of alternative network paths." (*Id.* at 16.) This again drives home the concept of continuity, which comports with the patentee's word choice in calling the SIP signaling a "***sequence***," of a repeating or continuing design. Although the Court declines to adopt the PTAB's construction, as Plaintiff suggests in the alternative, the impetus behind the PTAB's reasoning aligns with the rationale herein.

To summarize, Defendants have failed to meet their high burden of persuasion to show this term is indefinite. The Court expressly rejects both parties' proposed alternative constructions as improperly narrow. The Court further declines to adopt the PTAB's construction of this term.

The Court finds the term "SIP signaling sequence of the transmission is maintained," **is not indefinite and means "maintaining continuity in the signaling sequence of the SIP used in the transmission."**

**4. "stream load balancing"**

| Claim term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "stream load balancing"<br><br>('554 Patent, claims 3 and 17) | Plain and ordinary meaning.<br><br>Alternatively, "an event when an RTP stream is signaled to move to a different wide area network ("WAN")." | Plain and ordinary meaning (i.e., … as a result of stream load balancing based on a measured stream load) |

The issue as to this term is whether "stream load balancing" requires measuring the stream load, as Defendants propose.

Plaintiff argues for the plain and ordinary meaning of this term because requiring the stream load to be measured inserts a specific measuring step that is not claimed. According to Plaintiff, there are multiple ways to achieve stream load balancing that do not require any measurements, and none of the disclosures in the specification require measuring. Plaintiff also submits an alternative construction that it believes aligns with the written description without limiting it to preferred embodiments.

Defendants respond with a different plain and ordinary meaning submission premised upon the concept that balancing must involve measuring something and then taking an action to equate one measurement to another. Later during oral argument, however, Defendants took back the requirement that load balancing means the loads must be made equal. Defendants instead contend

that Plaintiff's proposal is overbroad because it encompasses ***any*** event moving an RTP stream to a WAN without regard to the notion of balancing, such as moving all the communication streams, which is clearly not balancing the stream load. Lastly, Defendants point to an embodiment in the specification illustrating the need to rebalance stream loads if a large PC file transfer were to occur as an instance where some quantitative weighing of the stream loads would take place.

The Court turns first to the claim language to begin its analysis. The term "stream load balancing" appears in dependent claim 3, which is representative of claim 17, which is reproduced below. Claims 2 and 4 are also relevant to inform this analysis.

> 2. The method of claim 1 wherein the switch from the first network path to the one of a plurality of alternative network paths occurs as a result of a stream quality event.
>
> 3. The method of claim 1 wherein the switch from the first network path to the one of a plurality of alternative network paths occurs as a result of **stream load balancing**.
>
> 4. The method of claim 1 wherein the switch from the first network path to the one of a plurality of alternative network paths occurs as a result of an administrator move.

Claims 2-4 provide three separate reasons for switching the transmission from one network to another. Each reason is distinctly claimed and each must be attributed meaning. Thus, "stream load balancing" must have a different meaning from "stream quality event" and "administrator move." Consequently, Plaintiff's proposed construction that "load balancing" is "an event when an RTP stream is signaled to move to a different wide area network ("WAN")" is incorrect as overly broad in that it would swallow claims 2 and 4. In fact, simply requiring the RTP stream to be signaled to move irrespective of the reason reads out the additional limitations in the dependent claims altogether. For that reason, the Court rejects Plaintiff's proposal.

FIG. 4 in the specification, reproduced in part below, illustrates the three distinct reasons

for switching the transmission as claimed in dependent claims 2-4.

Fig 4 Move SIP Control Flow and RTP Stream. The Flow Chart




The corresponding flow chart description in column 4 of the '554 Patent adds additional information about each reason for the transmission switch, as follows:

| | |
|---|---|
| [110] | A stream quality event is "when the RTP stream quality drops below or exceeds configured quality thresholds. The thresholds can be based on MOS scale, SWiQI index, jitter, latency, out of order packet events, packet loss events, packet duplication events and RTCP events." |
| [120] | Stream load balancing is when "[a]n RTP stream may be signaled to move in order to achieve the desired load balancing results." |
| [130] | An admin move is when "[t]he administrator may want to move specific RTP streams to a different WAN link." |

The specification further discloses an example of moving a stream for load balancing reasons as shown in step [120] when two active phones are using the same WAN path and a large PC file transfer gets triggered on the same path. In that instance, the gateway decides to preemptively optimize for VoIP quality by moving one stream to a better path. (7:1-18.) Thus, while some action is taken to shift the stream load, it does not have to be a quantitative measurement, as Defendants advance. Indeed, it can be a general assessment that the file transfer takes up all the bandwidth on the network path so the transmission stream must be moved or disconnected. Or the move can be triggered as a preemptive optimization, as disclosed in the specification, due to the appearance of the file transfer alone without consideration for the stream load. Or the move can be the result of

a simple round robin or algorithmic assignment. No measurement of the stream load is necessary in such instances. The Court therefore rejects Defendants' proposal that the plain and ordinary meaning of this term requires measuring the stream load. Measuring adds a step to the claimed method that is simply not present.

This interpretation comports with the intrinsic evidence as well as the parties' submitted dictionary definitions, which show that "load balancing" is a defined term well-known in the industry across distributed processing, network administration, and communications networks. The common concept across them all is that a skilled artisan would be familiar with various methods of allocating the load across multiple pathways to achieve a functional balance.

The Court therefore finds the term "stream load balancing" **means "allocating the stream load to achieve load balancing."**

**5. "SIP server"**

| Claim term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "SIP server"<br><br>('554 Patent, claims 5 and 19) | Plain and ordinary meaning. | "Server that receives and responds to a SIP INVITE request" |

The parties disagree whether this term is unclear and requires construction. Plaintiff contends that Defendants' proposal improperly limits the meaning of "SIP server" to one among many functions identified in the specification. Defendants disagree, arguing that the specification only discusses the SIP server in terms of performing authentication by receiving and responding to INVITE requests. Defendants further assert that a fundamental concept of a SIP server receiving a SIP INVITE is central to how a SIP server operates and is consistent with how one of skill in the art would have understood a SIP server to authenticate a transmission.

The disputed term appears in dependent claims 5 and 19. Claim 5, which is representative, reads as follows with the disputed term in bold:

> 5. The method of claim 1 wherein a **SIP server** associated with the one of a plurality alternative network paths may authenticate the transmission before it is switched.

As written, the plain language of claim 5 reads permissively in that a SIP server ***may authenticate the transmission before it is switched***. It does not say this is the only function the SIP server can perform and leaves open what else a SIP server may do. Nor does the claim dictate how the function of authenticating the transmission must be done. Even if the written description only discusses the SIP server performing authentications using a SIP INVITE request, exactly how that authentication process goes would be a matter of application and should not be imported into the claim.

The specification identifies the Session Initiation Protocol (SIP) as a "standard protocol" in use with VoIP that practitioners of ordinary skill in the art would be familiar with. ('554 Patent, 1:19-31.) No doubt, a practitioner familiar with SIP would be familiar with SIP servers, the various methods of authentication, and be aware of its capabilities beyond authenticating transmissions using the SIP invite request. Defendants do not submit any expert testimony in support of its proposition that a SIP server is only known in the art as a server that receives and responds to a SIP INVITE request. The Court declines to adopt Defendants' narrow proposal.

The Court finds the claim term "SIP server" **should be given its plain and ordinary meaning.**

**6. "the transmission…said transmission…the audio or video transmission"**

| Claim term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "the transmission…said transmission…the audio or video transmission"<br><br>('554 Patent, claim 15) | Not indefinite. Plain and ordinary meaning. | Indefinite |

The issue here is whether the term "the audio or video transmission" (as distinct from "the transmission" or "said transmission") is indefinite for lack of antecedent basis.

Plaintiffs contend that a person of ordinary skill in the art would understand that the plain and ordinary meaning of "the transmission . . . said transmission . . . the audio or video transmission" relates to the flow of data and audio/video content between a source and a destination. There is no confusion as to which transmission the claim is referring to, argues Plaintiff, because both the specification and the claims only refer to one transmission.

Defendants respond that this term is indefinite because there is no way to distinguish between "the transmission" and "the audio or video transmission" with reasonable certainty. Defendants argue "the audio or video transmission" lacks antecedent basis and is not the same transmission as the earlier recited "a transmission," "the transmission," or "said transmission." According to Defendants, these terms are written using different words and identifying the transmission as "audio or video" means the patentee intended a different and secondary meaning from a simple "transmission." Thus making "the audio or video transmission" ambiguous and consequently, indefinite.

These terms appear in claim 15 of the '554 Patent, which reads as follows with the disputed terms in bold:

> 15. A method of enhancing the reliability of **a transmission** from a source to a destination in a communications network using a network protocol that operates on top of the Internet Protocol (IP), the method comprising:
>
> transmitting data between a source and destination over a first network path made up of one or more network links where at least one of the network links is to a local area network that is remote from the transmission source;
>
> switching **the transmission** from the first network path to one of a plurality of alternative network paths;
>
> wherein **said transmission** is not disrupted as a result of said switch to the one of a plurality of alternative network paths, **said transmission** contains audio or video data, and at least one Port Address Translation (PAT) is performed on said transmission;
>
> **said transmission** contains audio or video content;
>
> **said transmission** contains data used in the control of <u>**the audio or video transmission**</u>;
>
> **said transmission** uses the Real Time Protocol (RTP);
>
> **said transmission** further uses the Session Initiation Protocol (SIP); and
>
> the SIP signaling sequence of the transmission is maintained after said switching from the first network path to the one of a plurality of alternative network paths.

As shown, the plain language of claim 15 provides for "a transmission from a source to a destination in a communications network . . . wherein . . . said transmission contains audio or video data . . . [and] said transmission contains audio or video content; [and] said transmission contains data used in the control of the audio or video transmission." Thus, the same transmission contains different types of information: audio or video data, audio or video content, and data used in the control of the audio or video transmission. There are not multiple transmissions or any ambiguity in ascertaining which, among multiple transmissions, "the audio or video transmission" is referring to. Rather, only one transmission is identified where the single transmission is either audio or video (in that it contains either audio or video data or content) and it contains various types of

information. Defendants' reading of "the audio or video transmission" as entirely divorced from the rest of the claim language is unreasonable and is hereby rejected.

Disclosures in the specification reinforce the recognition that the claimed transmission is a single audio or video transmission. The invention is titled a "Method for multiple link quality of service for voice and video internet protocol." The Abstract explains the invention is for achieving a certain quality of service for video and voice calls over the internet such that "voice and video calls can be moved at will from one path to another, as many times as required during a single conversation, without breaking the RTP voice or video payload stream." Throughout the patent are further descriptions and embodiments of moving video or audio payloads over networks using known standard protocols across various technical hurdles. A skilled artisan would readily recognize that "the audio or video transmission" is used in reference to the subject "transmission" of the claims. There is no discussion of choosing between several audio/video transmissions. Rather, the claims are aimed to preserve the quality and reliability of a single transmission.

Defendants have presented no expert testimony to the contrary, identified nothing in the specification that contradicts this interpretation, and therefore failed to overcome its high burden of persuasion. Rather, "the audio or video transmission" is properly referenced and its meaning within the claim is reasonably ascertainable to one skilled in the art. It is not indefinite for lack of antecedent basis.

The Court finds the terms "the transmission…said transmission…the audio or video transmission" **are not indefinite and should be given their plain and ordinary meaning.**

**7. "audio or video data…audio or video content…audio or video transmission"**

| Claim term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "audio or video data…audio or video content…audio or video transmission"<br><br>('554 Patent, claim 15) | Not indefinite. Plain and ordinary meaning. | Indefinite |

The issue as to these terms is similar to the preceding Term #6. The parties disagree on whether a person of ordinary skill in the art can reasonably understand the meaning of each of these terms because they use slightly different wording.

Specifically, Plaintiff submit that the plain and ordinary meaning of "audio or video data," "audio or video content," and "audio or video transmission" is clear as identifying data that is transmitted between the source and a destination, and which includes audio or video content. Regarding the distinction between "data" and "content," Plaintiff contends that data refers to the raw audio or video data packets that are transmitted over the network paths and content is the payload or refined output of an audio or video call.

Defendants disagree that such an understanding is reasonable, arguing that there is no difference between "audio or video data" and "audio or video content" in the claims, nor is any distinction clarified in the specification. It is Defendants' position that in a transmission, audio/video content is equivalent to audio/video data, and the same data can meet both limitations, so the claim term must be indefinite.

In its analysis, the Court first notes that the caselaw is clear that two different terms in a claim are presumed to have different meanings. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006). Defendants argued as much in the preceding term, even

though their argument was off the mark. Thus, there should be a meaningful distinction between "audio or video data" and "audio or video content" such that "data" and "content" are not synonymous. In addition, and as discussed *supra*, "data used in the control of the audio or video transmission" is a third identification of a required information type contained in the claimed transmission. Accordingly, Defendants are incorrect that these claim terms are indistinguishable from each other.

What's more, "data" is a broader and more generic term than "content" in the context of telecommunications, the latter of which is commonly identified with the substance of the communication rather than information about the communication. A lay person who has streamed audio or video over the internet, such as by using Spotify or YouTube, would easily understand the relative scope of video data (metadata, timestamps, size of download) as compared to video content (the visual or auditory content that can be played).

Indeed, the patent specification is written with such common knowledge presumed. The '554 Patent Abstract discloses a "method for achieving multiple link quality of service for video and voice calls over Internet links." Improving the quality of video and voice calls requires not only the content of the calls but also peripheral information about the call, unseen by the communicating parties, that identify the sender/recipient and facilitate the connection over the internet. The invention is also described to "appl[y] to computer and telecommunications networks . . . used in the control and transmission of video or audio payloads over networks using the Internet Protocol (IP)." ('554 Patent, 1:9-13.) The video or audio payloads reference the video or audio content. The specification then goes on to describe "data" in terms of size and allocating traffic across the bands, such as the load that certain transmission takes up, when explaining how "the wide area network (WAN) link is typically a bottleneck where voice and video traffic may compete

for scarce bandwidth with data traffic (such as file transfers)." (*Id.*, 1:63-66.) And assesses the audio and video data in relation to other data by how "[v]oice and video traffic are often given better treatment by limiting the amount of bandwidth consumed by normal data traffic (such as PC file transfers)." (*Id.*, 2:1-4.)

The clear difference in meaning between these terms is laid out in the claim language and clarified in the written description. Defendants have presented no evidence otherwise nor met their high burden to show these terms to be indefinite. Accordingly, the Court is persuaded that a skilled artisan would not be confused and these terms are not indefinite. Having found these terms not indefinite, the Court notes that Defendants agree the plain and ordinary meaning applies.

The Court therefore finds the terms "audio or video data…audio or video content…audio or video transmission" **are not indefinite and should be given their plain and ordinary meaning.**

## V. CONCLUSION

The Court adopts the constructions as set forth in this opinion for the disputed terms of the Patents-at-Issue.

The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 15th day of May, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE