**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **ASPEN NETWORKS, INC.,**<br><br>  **Plaintiff,**<br><br>  v.<br><br>**AT&T MOBILITY, LLC,**<br><br>  **Defendant.** | **Civil Action No. 2:23-cv-00476-RWS-RSP**<br><br>**LEAD CASE** |
| **ASPEN NETWORKS, INC.,**<br><br>  **Plaintiff,**<br><br>v.<br><br>**CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS,**<br><br>  **Defendant.** | **Civil Action No. 2:23-cv-00557-RWS-RSP** |
| **ASPEN NETWORKS, INC.,**<br><br>  **Plaintiff,**<br><br>v.<br><br>**T-MOBILE USA, INC.**<br><br>  **Defendant.** | **Civil Action No. 2:23-cv-00558-RWS-RSP** |

**DEFENDANT T-MOBILE'S
<u>MOTION TO EXCLUDE THE EXPERT OPINIONS OF JUSTIN R. BLOK</u>**

**TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................................... ii

II.     FACTUAL BACKGROUND......................................................................................... 4

III.    LEGAL STANDARD...................................................................................................... 5

IV.     ARGUMENT................................................................................................................... 6

        A.      Mr. Blok's Cost-Savings Opinions Based On The ACG Paper Are Not Tied To The Particular Facts Of This Case ........................................................................... 6

        B.      Mr. Blok Fails To Apportion For The '554 Patent's Claimed Functionality ......... 8

                a.      Mr. Blok Ignores T-Mobile's Predecessor Wi-Fi Calling Services............ 9

                b.      Mr. Blok Relies On Mr. Minor's Unreliable Apportionment Analysis...... 9

                c.      Mr. Blok's Opinions Impermissibly Include Calls Without Handovers... 11

                d.      The Entire Market Value Rule Cannot Justify Mr. Blok's Opinions ....... 11

        C.      Mr. Blok's CapEx/OpEx Ratio Is Legally Unsupportable ................................... 12

        D.      Mr. Blok's Discussion Of Mr. Minor's Gain-of-Function And Subscriber-Funded Infrastructure Theories Should Be Excluded........................................................ 14

V.      CONCLUSION.............................................................................................................. 15

i

<div style="background:black">████████</div>

# TABLE OF AUTHORITIES

**CASES**

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)......................................................................................................2, 5

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F. 3d 1201 (Fed. Cir. 2014)........................................................................................13

*Exafer Ltd. v. Microsoft Corp.*,
  719 F. Supp. 3d 749 (W.D. Tex. 2024), *aff'd*, No. 1:20-CV-131-RP, 2024 WL
  4526045 (W.D. Tex. Apr. 11, 2024)..................................................................................11

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
  879 F.3d 1332 (Fed. Cir. 2018)........................................................................................5, 8

*Finjan, Inc. v. ESET, LLC*,
  No. 17-CV-183-CAB-BGS, 2019 WL 5212394 (S.D. Cal. Oct. 16, 2019) ........................7, 15

*Finjan, Inc. v. ESET, LLC*,
  No. 3:17-cv-0183, 2019 WL 7290961 (S.D. Cal. Dec. 30, 2019) ............................................7

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997).............................................................................................................5

*In re Taxotere (Docetaxel) Prods. Liab. Litig.*,
  26 F.4th 256 (5th Cir. 2022) .........................................................................................9, 14

*LaserDynamics, Inc. v. Quanta Comp., Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)...........................................................................................8, 12

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
  30 F.4th 1339 (Fed. Cir. 2022) ......................................................................................7, 11

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  904 F.3d 965 (Fed. Cir. 2018)..............................................................................................12

*Provisur Techs., Inc. v. Weber, Inc.*,
  119 F.4th 948 (Fed. Cir. 2024) .......................................................................................8, 11

*Sound View Innovations, LLC v. Hulu, LLC*,
  33 F.4th 1326 (Fed. Cir. 2022) .........................................................................................7, 8

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011)..................................................................................5, 12, 13

*VirnetX, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014)................................................................................7, 11, 12, 13

**OTHER AUTHORITIES**

Federal Rule of Evidence 702................................................................................................5

https://www.statista.com/statistics/185828/average-local-mobile-wireless-call-
   length-in-the-united-states-since-1987/ ...........................................................................4

## I.    INTRODUCTION

In arriving at his "fully paid-up lump sum reasonable royalty figure" of ▋▋▋▋▋▋ for T-Mobile, Mr. Blok theorizes that T-Mobile saved costs by using T-Mobile's accused Wi-Fi Calling 2.0 service to "offload" calls from T-Mobile's cellular network, minimizing the need for T-Mobile to build out that cellular network—leading to his conclusion that Aspen should share in a portion of these supposed cost-savings.  Ex. 1, Blok Rpt., Ex 4.0.  Mr. Blok's methodology as to T-Mobile is flawed and unreliable, and therefore should be excluded, for multiple reasons.  These include, most importantly, that Mr. Blok fails to account for T-Mobile's unique circumstances.

*First*, Mr. Blok's damages calculation is not tied to the facts and evidence in T-Mobile's case, and produces a near-identical result for all three carrier-defendants.  It does so despite the differences in each carriers' histories, investments in their cellular networks, use of Wi-Fi calling services, and evidentiary records.  This is because Mr. Blok relies exclusively on an ACG "research paper"—which is just an outdated sales pitch from a Wi-Fi equipment vendor—to calculate that T-Mobile somehow saved ▋▋▋ by using Wi-Fi calling.  Mr. Blok then applies Mr. Minor's 30% apportionment value and a separate ▋▋▋ "benefit split" based on T-Mobile's CapEx/OpEx ratio—both of which are erroneous for the reasons discussed below—to conclude that T-Mobile should pay a royalty of ▋▋▋▋.  This ACG paper may reflect the savings a generic carrier might have enjoyed due to the behavior of a generic customer, and this is presumably why Mr. Blok reaches similar results for all three carriers (a point that T-Mobile may not be permitted to test on cross-examination at trial and which should be addressed by the Court in its gatekeeping role now).

Notably, the law does not allow Mr. Blok to stop with his generic analysis; instead, he must assess whether his ACG calculations are reasonable for T-Mobile, given the mountains of evidence T-Mobile produced about its *actual* network and its *actual* customer behavior.  He has not done this.  For instance, Mr. Blok did not investigate T-Mobile's long history as the first company (by

nearly a decade) to launch Wi-Fi calling, its extensive and large investments in its cellular network over a period of decades, the capacity of T-Mobile's network, its ability to absorb voice calls (i.e., relatively tiny bits of data) onto its cellular network, or the continually-decreasing coverage gaps in T-Mobile's cellular network over the decades (i.e., that one of the reasons that originally led T-Mobile to develop and deploy Wi-Fi calling twenty years ago no longer exists).  Mr. Blok also did not contrast the assumptions of his outdated ACG position paper (which states that carriers save $0.01/minute when its subscribers make Wi-Fi calls) with the reality that T-Mobile has preferred for at least the past six years that its customers *not* use Wi-Fi calling and has even required that all phones on its network be set to "cellular preferred"—meaning that subscribers will in fact be making cellular voice calls even when on Wi-Fi, in many instances.

*Second,* although Mr. Blok reduces his damages amount from ███████ (T-Mobile's supposed cost savings) to ████████ (Aspen's supposed share of it), his reductions are unreliable and he fails to adequately apportion, relying on a conclusory, arbitrary, and facially outsized 30% "technical apportionment" number from Aspen expert John Minor.[1]  Mr. Blok—and Mr. Minor, before him—ignores that T-Mobile was the only carrier to offer Wi-Fi calling (including with handovers) for almost ten years before the damages period began, incorrectly stating that he had seen no evidence that prior versions of Wi-Fi calling offered the benefits of handovers.  He gives no credence to the reality that T-Mobile's prior art HotSpot@Home anticipated all aspects of the '554 patent's claims, except for the use of "SIP" systems, which also predate the '554 patent.  Mr. Blok's failure to acknowledge T-Mobile's history of innovation irrevocably skews the apportionment analysis.  Additionally, although Mr. Blok admits that Wi-Fi calls without a handover do not infringe, he ignores T-Mobile data showing that ████████████████████

---

[1]    T-Mobile challenges Mr. Minor's calculation in its *Daubert* motion for Mr. Minor.

███████████

████████ and does not make any adjustment to his apportionment analysis on this basis.[2] At his deposition, Mr. Blok took the position that he did not need to discount for calls with no handovers because the '554 patent was "foundational" to Wi-Fi calling. Ex. 2, Blok Tr. at 71:14-72:22, 84:11-85:6. He did not pressure test this informal suggestion that the '554 patent is "foundational," moreover, by looking to T-Mobile's own prior art HotSpot@Home system. Regardless, under black-letter patent law, calling a patent "foundational" does not eliminate the requirement to apportion. Mr. Blok's opinions that derive from Mr. Minor's apportionment analysis should be stricken for these reasons alone.

*Third*, the other discounts that Mr. Blok applies to his cost-savings estimates do not solve these problems. For instance, Mr. Minor provided an opinion about the ratio of T-Mobile's capital expenditures (or "CapEx"—e.g., expenditures to acquire spectrum) to its operational expenditures (or "OpEx"—e.g., expenditures to operate its cellular towers) and claims that this can be used as a proxy to determine how any purported cost savings should be split between T-Mobile and Aspen. But T-Mobile's capital and operating expenditures—including the ratio of them—are completely unrelated to T-Mobile's spending on licensing and developing technology, such that they say nothing about how T-Mobile would split any alleged costs with Aspen. Not only that, but this approach necessarily incorporates and repeats many of the mistakes by Mr. Minor in apportioning originally because it ignores that *T-Mobile* and the other holders of thousands of patents for Wi-Fi, cellular, Wi-Fi calling, and other technologies would have to be credited on the "capital" side of the equation (i.e., because these others, including T-Mobile, developed the relevant

---

[2] A phenomenon called "ping-ponging" artificially inflates this number because a single call can have many handovers (i.e., it can "ping-pong" between Wi-Fi and cellular networks, such as when someone wanders in and out of their basement over the course of a single call), which Mr. Blok also did not take into account. But the key point here is that he did not discount at all for any calls that lack handovers, regardless of how one counts how many calls do or do not have them.

3

technologies), doubling the effects of those mistakes.

**Fourth,** and relatedly, Mr. Blok's opinions are based in part on Mr. Minor's "gain-of-function" analysis and "subscriber Wi-Fi access point payment" models, which are themselves unreliable and should be excluded, as explained in T-Mobile's motion for Mr. Minor. To the extent that Mr. Minor's opinions are not permitted, neither should Mr. Blok's opinions based on them. For example, as a supposed "validation" that his ACG-based calculation of T-Mobile's alleged cost-savings are "conservative," Mr. Blok multiplies the output of Mr. Minor's "gain-of-function" analysis by T-Mobile's CapEx and OpEx expenditures (a different use of those numbers than described above) to estimate T-Mobile's cost savings. Not only is there no need for complex models and estimates where there is direct evidence as to T-Mobile's lack of cost savings, but the approach here makes no sense: at its core, this approach merely assumes that how much someone **spends** bears on the question of how much someone **saves**. But that is flat wrong: if someone buys the nicest and most expensive car on the market, they haven't saved money at all; they've spent it. In short, Mr. Blok's application of Mr. Minor's complicated "multipliers" and other misplaced models should not be permitted to confuse the jury.

## II.     FACTUAL BACKGROUND

Mr. Blok presents his calculation of ▮▮▮▮▮▮ in damages for T-Mobile in Exhibits 4.0 and 4.1 to his report. Mr. Blok's analysis is based on a 2017 article (the "ACG paper") in which the following statement appears: "the implementation of VoWiFi across the mobile network can save mobile operators 1¢/min/subscriber on voice calls." Ex. 1, Blok Report ¶206. Mr. Blok therefore considers the number of T-Mobile Wi-Fi calls during the damages period, estimates that each call lasts 1.8 minutes—calling into question whether such short calls would experience a handover—and assumes that T-Mobile nevertheless saved $0.01 for every minute its customers spent on any Wi-Fi call. *Id.* at ¶134 (citing https://www.statista.com/statistics/185828/average-

local-mobile-wireless-call-length-in-the-united-states-since-1987/), Exhibit 4.1.  To arrive at his final damages calculation, Mr. Blok subsequently applied (1) a 30% apportionment discount, based on Mr. Minor's apportionment calculation, (2) a bargaining split of ▮▮▮▮ based on "the ratio of [each defendant's] capital expenditures to its adjusted operating costs," which incorrectly assumes that capital expenditures are a proxy for technology development costs and that operating expenses are a proxy for implementation of Aspen's technologies; and (3) a discount to account for "net present value" of his total damages figure.  Ex. 1, Blok Report ¶¶ 219-225 & Exhibit 4.0.

It is undisputed in this case that the '554 patent does ***not*** cover all of Wi-Fi calling.  The inventors, Aspen's technical expert, and Mr. Blok himself admitted that Aspen did not invent Wi-Fi calling.  *See, e.g.*, Blok Dep., 46:12-16.  The asserted claims are all method claims, moreover, and cover a specific scenario—switching from one network (like cellular) to another (like Wi-Fi)—while a call is in progress.  Yet neither Mr. Blok nor Mr. Minor adjust to account for Wi-Fi calls with (or without) handovers.  Ex. 1, Blok Report ¶¶ 209-10, ¶ 219, & Exhibit 4.0.

## III.    LEGAL STANDARD

Under *Daubert* and Federal Rule of Evidence 702, this Court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1306 (Fed. Cir. 2011).  Evidence is not relevant—i.e., the necessary "fit" or "tie" to the facts is lacking—when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Additionally, "if the patentee fails to tie the theory to the facts of the case, the testimony must be excluded."  *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1349 (Fed. Cir. 2018).

5

## IV.    ARGUMENT

### A.  Mr. Blok's Cost-Savings Opinions Based On The ACG Paper Are Not Tied To The Particular Facts Of This Case

Mr. Blok's Exhibit 4.0 & 4.1 cost-savings calculation relies heavily on a third-party article by ACG that suggests a carrier "can" saves $.01 for every minute its subscribers spent on Wi-Fi calls. This article is not specific to T-Mobile, nor is it tethered to the facts of this case. Mr. Blok's reliance on this paper merits exclusion because that paper suffers three fundamental problems, discussed below. *See* Ex. 3, ACG paper.

***First,*** the ACG paper is about Wi-Fi calling generally, not the asserted claims of the '554 patent. Ex. 3, ACG paper at 3. The one-cent number that Mr. Blok relies on results from "the implementation of VoWiFi across the mobile network," confirming it is not specific to either Aspen's invention or even Wi-Fi calls ***with a handover***. *Id.* at 2. Nor does it consider that T-Mobile introduced the earliest Wi-Fi calling service in the nation, HotSpot@Home, in 2006. Ex. 4, Minor Dep., 26:3-15 (T-Mobile offered HotSpot@Home "as early as 2006"); Ex. 5, Rubin 11/19/25 Dep., 261:7-8 ("Q. Do you agree that HotSpot@Home had handovers? A. Yes."). To the extent T-Mobile saved costs from Wi-Fi calling (or, more specifically, Wi-Fi calling handovers), it would have been doing so for years prior to any infringement—any such savings thus have nothing to do with the '554 patent, which did not issue until 2011. Moreover, because Mr. Blok never considers the investments T-Mobile made in its cellular network (even as it was a first-mover in Wi-Fi calling), the resulting capacity of T-Mobile's cellular network, and the relative demands of voice versus other types of data (e.g., video streaming) on T-Mobile's networks, his analysis is disconnected from T-Mobile's network. Ex. 6, Fonseca Rpt. at 6-8, 12-15. With direct evidence available for T-Mobile in this case of no cost-savings (*id.* at 18), it is inexcusable that Mr. Blok relies on a model that ignores that direct evidence and results in near-

6

identical damages calculations for carriers that are each situated completely differently. *See, e.g.*, *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1357 (Fed. Cir. 2022) (noting that "direct evidence" is not required in every case, but criticizing damage expert who "did not address or rely on any evidence … that estimated the amount or percentage of sold devices that were actually used to infringe the claimed method"); *Finjan, Inc. v. ESET, LLC*, No. 17-CV-183-CAB-BGS, 2019 WL 5212394, at *4 (S.D. Cal. Oct. 16, 2019), *on reconsideration in part*, No. 3:17-cv-0183, 2019 WL 7290961 (S.D. Cal. Dec. 30, 2019) ("Because the actual costs can be determined, [expert's] hypothetical construction of [defendant's] costs is facially unreasonable."); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1333 (Fed. Cir. 2014) (expert testimony must be "tied to the particular facts"); *see also* AT&T Motion to Exclude Blok (filed Jan. 20, 2026); Verizon Motion to Exclude Blok) (filed Jan. 20, 2026)).

***Second,*** the ACG paper lacks sufficient information to determine its reliability, and Mr. Blok did not test or investigate its accuracy. Critically, this ACG paper is a ***marketing*** document by a vendor trying to sell network equipment for Wi-Fi calling. Entitled "Economic Advantages of Virtualized WiFi Access for WiFi," it is sponsored by Affirmed Networks, which Mr. Blok acknowledged is a vendor of "various solutions related to Voice over Wi-Fi." Ex. 3 (ACG paper). Because he did not find a better source or bring a critical eye to the bold claims of this ACG paper, Mr. Blok's opinions relying on it are unreliable. *Sound View Innovations, LLC v. Hulu, LLC*, 33 F.4th 1326, 1338 (Fed. Cir. 2022) (expert must have "adequate basis for treating the [study's] results … as sufficiently tied to the invention"). Mr. Blok did not know what data ACG relied upon, how it selected that data, what "model" it used, or what calculations suggested Wi-Fi calling leads to savings of one cent per minute, which is why he agreed that he "do[es] not know exactly how ACG arrived at its opinions." Ex. 2, Blok Tr., 122:2-16, 125:16-25-126:2; 129:20-130:7. Likewise, although he initially guessed the ACG paper could be about T-Mobile, but he could not explain the

large discrepancies between T-Mobile's subscriber penetration numbers and those used by ACG, ultimately conceding he could not identify the unnamed carrier. *Id.*, 133:7-16; 134:11-13.

*Finally*, the ACG paper analyzed a "Wi-Fi First" network. But T-Mobile's Wi-Fi calls have been "cellular preferred" since at least 2018. Ex. 2, Blok Tr., 124:7-20 (agreeing T-Mobile switched to "cellular preferred" "within a year" of the damages period start in this case); Ex. 6, Fonseca Rpt., at 10-11. This is direct proof that T-Mobile is not using its Wi-Fi calling service to save $0.01 cent (or any other amount) per minute; instead, T-Mobile is trying to route its customers *away* from using Wi-Fi calling, including because it has sufficient capacity to handle those calls on its cellular network and can better control call quality for its cellular network. *Id.* Because T-Mobile's accused services are fundamentally different from that in the ACG paper, Mr. Blok cannot show that paper is "sufficiently tied to the invention as claimed." *Sound View Innovations*, 33 F.4th at 1338. And, while Mr. Blok superficially claims to have taken into consideration Wi-Fi preferred vs. cellular preferred (Tr., 214:21-14), he cannot legitimately compensate for differences between T-Mobile and the ACG paper's subject carrier when he has no idea how ACG reached its conclusions.

### B.  Mr. Blok Fails To Apportion For The '554 Patent's Claimed Functionality

"[A] reasonable royalty award 'must be based on the incremental value that the patented invention adds to the end product.'" *Exmark*, 879 F.3d at 1348 (citations omitted). A royalty must "be apportioned between infringing and noninfringing features of the accused product." *Provisur Techs., Inc. v. Weber, Inc.*, 119 F.4th 948, 957 (Fed. Cir. 2024); *LaserDynamics, Inc. v. Quanta Comp., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (noting need to apportion patented and unpatented features).

Mr. Blok relied on a technical apportionment percentage of 30% that he obtained entirely from Aspen expert John Minor, which he then applies to his cost-savings based on the ACG paper. Ex. 2, Blok Tr. 136:22:-137:1; Ex. 1, Blok Report ¶209 ("I relied on Mr. Minor's analysis of the

8

technological contribution of the '554 Patent to the Accused T-Mobile Service."), Exhibit 4.0. Indeed, Mr. Blok admitted that he did not have the qualifications to support or doubt Mr. Minor's opinions.  Blok Tr. 24:13-18.

### a.  Mr. Blok Ignores T-Mobile's Predecessor Wi-Fi Calling Services

Unlike the other carriers, T-Mobile offered Wi-Fi calling *with handovers* in 2006, years before Aspen filed for the '554 patent.  This cannot be reconciled with Mr. Blok's crediting of the benefits of Wi-Fi calling to Aspen.  Blok Tr. 70:14-22; *see also id.* 51:24-52:4.  Mr. Blok ignores T-Mobile's history, stating that he had a "general understanding" that Wi-Fi did not gain traction until after the allegedly infringing version of Wi-Fi calling was implemented, and that he had not seen any information suggesting prior versions of Wi-Fi calling provided any benefit.  *Id.* 53:5-20. When asked whether T-Mobile's initial 2006 Wi-Fi calling service provided cost savings, Mr. Blok admitted he did not know and had not discussed the issue with Aspen's technical experts.  *Id.* 69:16-70:12; 72:16-73:1.  In short, T-Mobile was in a fundamentally different position from the other defendants, who had no earlier versions of Wi-Fi calling before the accused services; yet, Mr. Blok made no adjustments for this fact.

### b.  Mr. Blok Relies On Mr. Minor's Unreliable Apportionment Analysis

As discussed in T-Mobile's contemporaneously filed motion for Mr. Minor, his 30% apportionment analysis is unreliable both on its face and once one considers how it was calculated, and it should be excluded.  Under Fifth Circuit law, excluding Mr. Minor's apportionment analysis also mandates excluding all of Mr. Blok's analysis based on it.  *E.g.*, *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 26 F.4th 256, 269 n.10 (5th Cir. 2022) (explaining that if an expert relies on another witness' now-excluded testimony that is "critical to the expert's testimony" and "not independently verified by the expert," then the expert's testimony relying on inadmissible evidence should be excluded).

As explained in more detail in T-Mobile's contemporaneously filed motion for Mr. Minor, his apportionment opinions—relied on by Mr. Blok—should be excluded for five reasons. *First* and *second***,** the final 30% apportionment number Mr. Blok takes from Mr. Minor is both facially outsized and also conclusory *ipse dixit*, relying on "dependency weights" that came from his head with no particular process. Ex. 7, Minor Report at ¶¶187-89, 216; Minor Tr., 217:2-218:21 (disclaiming ability to specifically identify the process used to calculate dependency weights but describing it as "self-explanatory"). *Third***,** Mr. Minor's 30% apportionment figure was arbitrary, including because he assumed the "dependency weights" had to sum to 100% of the Wi-Fi calling service. Ex. 7, Minor Report ¶188; *see also id.*, ¶¶ 185-90, 196. *Fourth***,** Mr. Minor's apportionment opinion fails to properly consider the limited scope of the asserted claims, which relate to handovers in a SIP-based system. Ex. 7, Minor Report at ¶183 (analyzing "the VoWiFi service model"), ¶¶186-187 ("overall VoWiFi performance"). Mr. Minor asserts that his apportionment "considers" calls with no intervening handover because the "Wi-Fi Calling framework would be inefficient and not commercially viable in the absence of the handover capability." Ex. 7, Minor Report at ¶218. There is no support for this statement, which is contradicted by T-Mobile's concrete experience and evidence: when T-Mobile removed handovers from its earlier versions of Wi-Fi calling, consumers did not react *at all*. Ex. 6, Fonseca Rpt., pp. 27-28 (noting that T-Mobile removed handovers from earlier versions of Wi-Fi calling without customer impact). Mr. Minor and Mr. Blok do not take that into account. *Fifth*, Mr. Minor also fails to account for prior art Wi-Fi calling services, including T-Mobile's 2006 HotSpot@Home service that had handovers, nor does he consider the thousands of patents covering Wi-Fi and cellular generally. Ex. 2, Blok Dep., 34:13-35:13. It is unreasonable to suggest that the '554 patent somehow represents 30% of the benefits of Wi-Fi calling, given these issues.

███████████

### c.    Mr. Blok's Opinions Impermissibly Include Calls Without Handovers

Mr. Blok, like Mr. Minor, failed to apportion to address the fact that the incremental value of the '554 patent related to SIP-based handovers.  Aspen's experts acknowledged that calls without such handovers do not infringe.  *E.g.,* Ex. 2, Blok Tr. 74:25-75:5; Ex. 7, Minor Report, ¶218.  But Mr. Blok included non-infringing calls in his royalty base anyway.

This is jarring for all of the carriers, but particularly so for T-Mobile.  For instance, T-Mobile provided uncontroverted data showing that ████████████████████████████████ ███████████████████████████████████.  But, despite acknowledging the desirability of "actual data," Ex. 2, Blok Tr. 136:19-21, Mr. Blok ignored T-Mobile's data entirely.  *See* Ex. 9, Rowe Rpt., ¶236 (citing TMO-ASPEN-0285984).

It is legal error to include the value of non-infringing uses in a royalty: "patentees cannot recover damages based on sales of products with the mere capability to practice the claimed method."  *Niazi*, 30 F.4th at 1357; *Exafer Ltd. v. Microsoft Corp.*, 719 F. Supp. 3d 749, 754 (W.D. Tex. 2024), *aff'd*, No. 1:20-CV-131-RP, 2024 WL 4526045 (W.D. Tex. Apr. 11, 2024) (excluding apportionment analysis of Mr. Blok—Aspen's damages expert—for valuing accused features based on virtual machines that were not accused of infringement).  Damages experts who "fail[] to apportion value between the patented features and the vast number of non-patented features contained in the accused product" are regularly excluded.  *See, e.g.*, *VirnetX*, 767 F.3d at 1329; *Provisur Techs.,* 119 F.4th at 958.

### d.    The Entire Market Value Rule Cannot Justify Mr. Blok's Opinions

The entire market value rule cannot justify Mr. Blok and Mr. Minor's failure to properly apportion.  At his deposition, Mr. Blok stated that he had a vague understanding that the '554 patent "is foundational and is a gating feature that has allowed for the successful implementation of" Wi-Fi calling, as discussed above. Ex. 2, Blok Tr., 71:14-72:22, 84:11-85:6.  But this opinion does not

11

appear in Mr. Blok's report.  Moreover, Mr. Blok testified that he "do[es] not have the expertise to support or doubt Mr. Minor's opinions."  *See* Ex. 2, Blok Tr. at 24:13-18.

Under the law, saying something is "foundational," "gating," or essential is not enough to claim the entire value (or, here, cost-savings) for an accused product (like Wi-Fi calling) under the entire market value rule when the claims at issue do not cover the entire product, as they clearly do not here, given T-Mobile's own prior art Wi-Fi calling system.  The entire market value rule is a narrow exception to the apportionment requirement.  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977-78 (Fed. Cir. 2018).  It is "a demanding alternative" and requires rigorous proof that the patented feature drives demand for the entire product.  *See id*; *LaserDynamics*, 694 F.3d at 67.  This is so the "reasonable royalty does not overreach and encompass components not covered by the patent."  *VirnetX*, 767 F.3d at 1326-27; *Uniloc*, 632 F.3d at 1320.

Using a SIP-based system that supports Wi-Fi calling handovers plainly does not drive demand for T-Mobile's services.  Even Mr. Blok admitted at deposition "[i]t is not my opinion that Wi-Fi calling is driving demand for T-Mobile services."  Ex. 2, Blok Tr. 87:14-15.  Based on *Laser Dynamics*, that concession is dispositive; Mr. Blok should have apportioned for calls with/without handovers.

### C.  Mr. Blok's CapEx/OpEx Ratio Is Legally Unsupportable

As part of his damages calculation, Mr. Blok—after calculating T-Mobile's alleged cost-savings through his use of the ACG proposal paper—conducted what he called a "benefit split" for T-Mobile's Wi-Fi calling handovers by using the ratio of its capital expenditures ("CapEx") with adjusted operating costs ("OpEx"), referred to as a "CapEx-to-OpEx ratio."  Blok Report, ¶¶222-23, Exhibit 4.2.0.  The ratio is, effectively, a further discount on the inflated estimated of T-Mobile's cost-savings based the ACG paper calculation, after the flawed apportionment discount.

12

Looking at this CapEx-to-OpEx ratio, Mr. Blok concludes that the expected benefit due to Aspen for its contributions to Wi-Fi calling is ███.[3]  *Id.*, ¶223, Exhibit 4.2.0.  He then states, without support, that "Aspen and [the carriers] would have recognized this ratio provides an indication of T-Mobile's costs ***attributable to acquiring technology*** in support of its wireless network relative to the costs associated with ***commercializing and operating*** this network," such that this ratio reflects "the portion of the apportioned benefits Aspen would expect to receive from T-Mobile" for T-Mobile's Wi-Fi calling service.  *Id.*, ¶222 (emphasis added).  Mr. Blok offers no support for this ratio because it is unsupportable: it is completely untethered to the facts of this case. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F. 3d 1201, 1226, 38-40 (Fed. Cir. 2014); *VirnetX*, 767 F. 3d at 1326-28, 1330; *Uniloc*, 632 F. 3d at 1318.  Both the undisputed evidence and common-sense dictate that the CapEx/OpEx ratio should be stricken as unreliable.

***First***, Mr. Blok's use of a CapEx/OpEx ratio as a proxy for how to divide any alleged benefit of the '554 patent between Aspen and T-Mobile lacks any support in the record.  There is simply no basis to assume that T-Mobile would have considered the CapEx/OpEx ratio to be any sort of proxy, let alone a suitable one, for Aspen's alleged contributions to T-Mobile's Wi-Fi calling system.

***Second***, Mr. Blok's approach is facially unreasonable because it penalizes the carriers for investing in their cellular networks (even when trying to avoid using Wi-Fi calling).  Under his approach, the more a carrier invests in capital expenditures to build out its cellular network by

---

[3]    Although close numerically to Mr. Minor's 30% apportionment calculation and including some of the errors of the apportionment calculation, this is a different number, calculated in a different way, and used for a different purpose.  Blok Rpt., Exhibit 4.0.  Mr. Blok applies Mr. Minor's flawed and inflated 30% apportionment value to try to reflect the cost-savings attributable to the '554 patent; he separately applies his "benefit split" percentage of ███ to reflect the portion of costs supposedly owed to Aspen as the inventor (and T-Mobile as the operator) of that technology.  Blok, ¶¶222-23; Exhibit 4.0.

purchasing spectrum and other network equipment—which would increase coverage and obviate the need for WiFi calling—the more cost savings this CapEx/OpEx ratio will ascribe to Aspen. For instance, Mr. Blok acknowledged that purchasing spectrum is a capital expenditure and that in most years T-Mobile spent billions of dollars on spectrum acquisitions.  Blok Tr. 102:14-19; Blok Report ¶165.  It makes no sense that increased capital expenditures of this nature would lead to cost-savings, much less that Aspen deserves a meaningful portion of such purported cost savings, given that Aspen's patent is specific to handovers between a Wi-Fi/cellular network.  No rational economic actor would agree to such an assumption.

*Third*, for all the reasons described above when Mr. Blok made this mistake for other parts of his analysis, this deduction factor likewise dramatically overstates the value of Aspen's alleged innovation here.  *See* §IV.B, *supra.*

### D.    Mr. Blok's Discussion Of Mr. Minor's Gain-of-Function And Subscriber-Funded Infrastructure Theories Should Be Excluded

Apart from the Mr. Blok's overall cost-savings opinion, this Court should also exclude "the Technology Gain-of-Function [] framework" and the "cost of subscriber-funded Wi-Fi APs and broadband Internet service" from Aspen's other expert, Mr. Minor, that Mr. Blok discusses and relies upon in paragraphs 163-171 of Mr. Blok's report.  In this discussion, Mr. Blok references gain-of-function number ("approximately ███████") and a subscriber-funded infrastructure number ("approximately ███████").  *See* Ex. 1, Blok Report at ¶¶ 168, 171, 175.  But these numbers come entirely from Mr. Minor's calculations, which T-Mobile has moved to exclude as unreliable.  Mr. Blok even admitted that he could not opine on Mr. Minor's reasoning. Blok Tr. 24:13-18.  To the extent that Mr. Minor's opinions are excluded, so should any of Mr. Blok's testimony and opinions that rely on Mr. Minor also be excluded.  *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 26 F.4th at 269 n.10.

███████████████

Moreover, as discussed above, this approach of looking to T-Mobile's expenditures to estimate its savings is (again) inconsistent with the actual evidence of record. *Finjan*, No. 17-CV-183-CAB-BGS, 2019 WL 5212394, at *4 ("Because the actual costs can be determined, [expert's] hypothetical construction of [defendant's] costs is facially unreasonable."). For instance, T-Mobile's Senior Finance Manager, Dan Garrow, testified that ██████████████████ ████████████ and that T-Mobile was investing in its cellular network to be able to compete with other carriers. Ex. 10, Garrow Tr., 134:8-135:1. Similarly, Otto Fonseca, Senior Director of Capacity Planning, stated that ██████████████████████████ █████████████████████. Ex. 11, Fonseca Tr., 23:14-17, 98:6-99:2. Indeed, this approach would conclude that a carrier saves costs based on the use of Wi-Fi calling, even when that carrier is developing its cellular network specifically to avoid using Wi-Fi calling. Thus, Mr. Blok and Mr. Minor apply an unreliable methodology that must be excluded.

## V.    CONCLUSION

For the reasons above, T-Mobile respectfully requests that the Court strike and exclude the opinions of Mr. Justin Blok.

January 20, 2026

Respectfully submitted,

By: /s/ Amanda Tessar

Amanda Tessar (Colorado Bar #33173))
Trevor Bervik (*admitted pro hac vice*)
**PERKINS COIE LLP**
1900 Sixteenth Street, Suite 1400
Denver, Colorado 80202-5255
Tel: (303) 291-2300
Fax: (303) 291-2400
*ATessar@perkinscoie.com*
*TBervik@perkinscoie.com*

Martin E. Gilmore (SBN 24125080)

15

**PERKINS COIE LLP**
405 Colorado Street, Suite 1700
Austin, TX 78701
Tel: (737) 256-6100
Fax: (737) 256-6300
*MGilmore@perkinscoie.com*

Andrew Tyler Ohlert (*admitted pro hac vice*)
**PERKINS COIE LLP**
1301 2nd Avenue, Suite 4900
Seattle, WA 98101
Tel: (206) 359-8000
Fax: (206) 359-9000
*AOhlert@perkinscoie.com*

Melissa Richards Smith (SBN 24001351)
**GILLAM AND SMITH, L.L.P.**
303 South Washington Avenue
Marshall, TX 75670
Tel: (903) 934-8450
Fax: (903) 934-9257
*melissa@gillamsmithlaw.com*

**ATTORNEYS FOR DEFENDANT
T-MOBILE USA, INC.**

16



## CERTIFICATE OF SERVICE

The undersigned hereby certifies that counsel of record who are deemed to have consented to electronic services are being served with a copy of this document via electronic mail on January 20, 2026.

By: */s/ Kate Rose*
Kate Rose

## CERTIFICATE OF CONFERENCE

Counsel for T-Mobile conferred with counsel for Plaintiff on January 20, 2026 in a good faith attempt to resolve this matter without court intervention.  T-Mobile confirmed that Plaintiff is opposed to the relief sought herein.

By: */s/ Andrew Ohlert*
Andrew Ohlert

17