██████████████████████████

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| ASPEN NETWORKS, INC., <br><br> Plaintiff, <br><br> v. <br><br> AT&T MOBILITY, LLC, <br><br> Defendants. | **CASE NO. 2:23-cv-00476-RWS-RSP** <br> **LEAD CASE** <br><br> **JURY TRIAL DEMANDED** <br><br> ████████████████ |
| ASPEN NETWORKS, INC., <br><br> Plaintiff, <br><br> v., <br><br> T-MOBILE US, INC., ET AL., <br><br> Defendants. | **CASE NO. 2:23-cv-00558-RWS-RSP** <br> **MEMBER CASE** |

**PLAINTIFF ASPEN NETWORKS, INC.'S OPPOSITION TO T-MOBILE'S MOTION TO EXCLUDE THE EXPERT OPINIONS OF JUSTIN R. BLOK**

███████████████████████████

## TABLE OF CONTENTS

I.      FACTUAL BACKGROUND ................................................................................. 2

II.     LEGAL STANDARD ......................................................................................... 3

III.    ARGUMENT ...................................................................................................... 3

    A.      The ACG Research VoWiFi White Paper Is Used as an Industry Cost Metric; Any Gaps Go to Weight. ........................................................... 3

    B.      Mr. Blok Properly Apportioned the Calculated Value of VoWiFi to the Specific Contribution of the '554 Patent. ................................................. 6

        1.      Mr. Blok does not opine or rely on a theory that the '554 Patent is foundational or use the entire market value of VoWiFi. .......................... 7

        2.      Mr. Blok appropriately apportions his calculations of the value of VoWiFi using Mr. Minor's calculation of the '554 Patent's contribution to VoWiFi. ............................................................. 9

    C.      Mr. Blok's CapEx/OpEx Based Bargaining Split Is Standard and Record-Tethered. ................................................................................... 13

    D.      Reliance on Mr. Minor's "Tech GoF" and Subscriber-Funded Infrastructure Analyses is Limited and Confirmatory. ............................. 14

IV.     CONCLUSION ................................................................................................. 15

███████████████████████████████████████

## TABLE OF AUTHORITIES

### CASES

*Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*,
738 F.3d 960 (9th Cir. 2013)................................................................................ 5

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) ..................................................................... 11, 12

*Aqua Shield v. Inter Pool Cover Team*,
774 F.3d 766 (Fed. Cir. 2014) ........................................................ 9, 11, 12, 13

*Atlas Glob. Techs. LLC v. TP-Link Techs. Co.*,
No. 2:21-CV-00430-JRG-RSP, 2023 WL 4936210 (E.D. Tex. Aug. 2, 2023) ........................... 6

*Brumfield v. IBG LLC*,
97 F4th 854 (Fed. Cir. 2004) ..................................................................... 10, 11, 12

*Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*,
807 F.3d 1283 (Fed. Cir. 2015) ......................................................................... 9

*Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys.*,
809 F.3d 1295 (Fed. Cir. 2015) ......................................................................... 9

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ................................................................................... 3, 6

*EcoFactor, Inc. v. Google LLC*,
137 F.4th 1333 (Fed. Cir. 2025) ....................................................................... 15

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) ................................................................... 10, 14

*Estech Sys., Inc. v. Target Corp.*,
No. 2:20-CV-00123-JRG-RSP, 2021 WL 5154220 (E.D. Tex. July 21, 2021) ........................... 6

*Fujifilm Corp. v. Motorola Mobility LLC*,
No. 12-CV-03587-WHO, 2015 WL 1737951 (N.D. Cal. Apr. 8, 2015) .................................. 14

*Hanson v. Alpine Valley Ski Area, Inc.*,
718 F.2d 1075 (Fed. Cir. 1983) ................................................................... 11, 12

*Headwater Research LLC v. Samsung Elecs. Co., Ltd.*,
No. 2:22-cv-00422-JRG-RSP, 2025 WL 2145908 (E.D. Tex. July 29, 2025) ........................... 3

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010) ...................................................................... 6, 11

*IOEngine, LLC v. Roku Inc.*,
No. 6:21-cv-1296 (W.D. Tex.) ......................................................................... 14

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) .......................................................................... 9

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ............................................................................................. 9

*Mathis v. Exxon Corp.*,
  302 F.3d 448 (5th Cir. 2002) ................................................................................................ 3

*Multimedia Techs. PTE., LTD. v. LG Elecs., Inc.*,
  No. 2:22-cv-494 (E.D. Tex.)................................................................................................ 14

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
  30 F.4th 1339 (Fed. Cir. 2022) ............................................................................................. 7

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
  849 F.3d 1360 (Fed. Cir. 2017) ..................................................................................... 11, 12

*Realtime Data LLC v. EchoStar Corp.*,
  No. 6:17-CV-00084-JDL, 2018 WL 6266301 (E.D. Tex. Nov. 15, 2018) .............................. 14

*Scrum All., Inc. v. Scrum, Inc.*,
  No. 4:20-CV-227, 2021 WL 1725564 (E.D. Tex. Apr. 30, 2021) ..................................... 7, 13

*Sound View Innov., LLC v. Hulu, LLC*,
  33 F.4th 1326 (Fed. Cir. 2022) ............................................................................................. 5

*Summit6, LLC v. Samsung Elecs. Co.*,
  802 F.3d 1283 (Fed. Cir. 2015) ............................................................................................. 4

*TracBeam L.L.C. v. AT&T Inc.*,
  2013 WL 6175372 (E.D. Tex. Nov. 25, 2013)........................................................................ 7

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ............................................................................... 10, 13, 14

*Vega v. Ross Stores Inc.*,
  No. 4:24-CV-00733-SDJ-BD, 2025 WL 2601538 (E.D. Tex. Sept. 8, 2025) ............................ 4

*VirnetX, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014)................................................................................... 13, 14, 15

*Wi-LAN Inc. v. Sharp Elecs. Corp.*,
  992 F.3d 1366 (Fed. Cir. 2021) ............................................................................................. 4

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) ........................................................................................... 11

*Zarinebaf v. Champion Petfoods USA Inc.*,
  No. 10-cv-6951, 2022 WL 910638 (N.D. Ill. Mar. 29, 2022) .................................................. 4

T-Mobile's Motion (Dkt. 177) challenges the damages opinions of Justin Blok. In forming those opinions, Mr. Blok identified a September 2014 hypothetical negotiation, grounded his analysis in the *Georgia-Pacific* framework, and quantified a reasonable royalty using T-Mobile's own usage data, a cost-savings model tied to Wi-Fi Calling minutes of use, and a technical apportionment input provided by Aspen's telecommunications architecture expert, John Minor—exactly the sort of interdisciplinary coordination Rule 703 permits and courts routinely accept. Mr. Blok's report (Ex. A, "Blok T-Mobile Rpt.") reflects an extensive review of the full record—not only the facts cherry-picked by T-Mobile—and reasoned analysis based thereon, including the use of reasonableness-checks on his calculated royalty.

T-Mobile's theories for exclusion rest on a caricature of Mr. Blok's analysis, not the record. The Motion claims Mr. Blok "ignored" T-Mobile's legacy HotSpot@Home program and evidence on churn and cost savings. Mot. at 2, 9. On its face, Mr. Blok's report shows the opposite: he engaged with the history of T-Mobile's Wi-Fi calling implementations at length, including HotSpot@Home and later iterations, and he expressly evaluated the available evidence on churn, customer demands, and cost savings before reaching his conclusions. Blok T-Mobile Rpt. ¶¶ 16, 60-65, 128-197. The Motion misfires because it disputes weight, not admissibility, and because it tries to leverage a legacy, 2G/3G-era UMA implementation to suggest a modern non-infringing alternative in today's 4G/5G IMS/SIP environment—a leap the record does not support. Ex. K, TMO-ASPEN-0105944 at 946; Ex. B, Rubin T-Mobile Op. Rpt. ¶¶ 118-125; Ex. C, Rubin T-Mobile Reb. Rpt. ¶¶ 89-91.

T-Mobile's assertion that there cannot have been cost savings from VoWiFi implementation due to its contemporaneous large network investments (Mot. at 2) is nonsensical. It is just as reasonable for Mr. Blok to conclude that without VoWiFi, those investments would have been even higher or the desired coverage simply would not have been achieved. He considered these savings and did precisely

1

what courts expect from damages experts: he reviewed T-Mobile and third-party materials, credited what the record could support, and drew reasoned conclusions. Blok T-Mobile Rpt. ¶¶ 128-197. Mr. Blok concluded T-Mobile did, in fact, avoid calculable capital and operational expenditures as a result of VoWiFi, and checked the reasonableness of this calculation in reliance on technical expert analysis and T-Mobile's produced financials. He then transparently explained the inputs and apportionment steps applied to ensure the result reflected only the '554 Patent's contribution to its VoWiFi service. Blok T-Mobile Rpt. ¶¶ 208-210. T-Mobile's heavy reliance on disputed facts in its Motion underscores that it disagrees with Blok's expert opinion; it does not supply a basis to exclude him under *Daubert*.

## I.    FACTUAL BACKGROUND

Aspen accuses T-Mobile's Wi-Fi Calling ("VoWiFi") service of infringing the asserted claims of U.S. Patent No. 8,009,554 (the "'554 Patent"), which relate to seamless switching between network paths during an ongoing call. Mr. Blok's expert analysis derives a lump-sum reasonable royalty of ███████████ as of a September 2014 hypothetical negotiation, based on incremental cost savings directly tied to the accused VoWiFi service—followed by technical apportionment, a bargaining split, and present value discounting. Blok T-Mobile Rpt. ¶¶ 215-226; *see also* Mot. at 1-5.

- To calculate incremental cost savings, he applied actual call-volume data provided by T-Mobile and per-minute cost metrics, and corroborated reasonableness against technical network analyses by Aspen's expert John Minor and third-party industry research. Blok T-Mobile Rpt. ¶¶ 133, 166-179, 205-208, Ex. 4.1, and Ex. 8; Ex. E, Blok T-Mobile Dep. at 19:21 – 20:15, 47:21 – 48:14; *see also* Mot. at 1-2.

- He then apportioned to the '554 Patent's contribution using the 30–35% technical attribution provided by Mr. Minor. Blok T-Mobile Rpt. ¶¶ 202, 209; *see also* Mot. at 2-3.

- Finally, he applied a ██████ bargaining split informed by T-Mobile's CAPEX-to-OPEX ratio and discounted to the 2014 negotiation date using T-Mobile's weighted-average cost of capital.

Blok T-Mobile Rpt. ¶¶ 220-223; *see also* Mot. at 3-4.

Mr. Blok framed his analysis in standard *Georgia-Pacific* terms and his royalty computation is expressly contingent on the identified inputs, including apportionment. Blok T-Mobile Rpt., *passim.*

## II.   LEGAL STANDARD

Expert testimony is admissible if the expert is qualified, the testimony is helpful, and the opinions are the product of reliable principles and methods reliably applied to the case facts. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-94 (1993). In a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration. *See Headwater Research LLC v. Samsung Elecs. Co., Ltd.*, No. 2:22-cv-00422-JRG-RSP, 2025 WL 2145908, at *1 (E.D. Tex. July 29, 2025); *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."). As the Supreme Court explained in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002). For this reason, the Federal Circuit has consistently upheld experts' use of a hypothetical negotiation and *Georgia-Pacific* factors for estimating a reasonable royalty. *See, e.g., Micro Chem.,* 317 F.3d at 1393.

## III.   ARGUMENT

### A.   The ACG Research VoWiFi White Paper Is Used as an Industry Cost Metric; Any Gaps Go to Weight.

Rule 703 allows experts to base their opinions on third-party studies if these are typically relied

upon in the field. *See Wi-LAN Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1375 (Fed. Cir. 2021). The ACG Research VoWiFi White Paper—produced by an established telecom research firm that routinely publishes whitepapers, forecasts, and business-case analyses used by carriers—is exactly that. *See* Exs. O-P (ACG Websites); Ex. E, Blok T-Mobile Dep. at 49:19 – 50:4, 123:4-19. It analyzes cost reduction through VoWiFi, finding a one-cent per-minute savings based on a major operator's data. Ex. Q, ACG Paper at 2-5. Mr. Blok uses this figure and T-Mobile's calculated Wi-Fi minutes of use to estimate T-Mobile's VoWiFi cost savings, further reduced to the value of the '554 Patent using Mr. Minor's apportionment factor. Blok T-Mobile Rpt. ¶¶ 176-179, 209-210. Mr. Blok had no obligation to independently verify or replicate ACG Research's analysis. *See e.g., Vega v. Ross Stores Inc.,* No. 4:24-CV-00733-SDJ-BD, 2025 WL 2601538, at *4 (E.D. Tex. Sept. 8, 2025).

The ACG Research paper identifies VoWiFi as a solution to reduce voice delivery costs, showing substantial total cost of ownership ($2.2 billion) and EBITDA improvements ($2 billion) over a 5-year period, with metric details rooted in operator analysis, ultimately concluding that mobile network carriers can expect one-cent-per-minute savings on all Wi-Fi calls occurring on its network. ACG Paper at 2-5. T-Mobile acknowledges this one-cent-per-minute savings but argues the study lacks detailed model disclosure. Mot. at 6-7. However, Mr. Blok's report thoroughly discusses the ACG Research findings, confirming that this report is the type reasonably relied on by experts in the field. *Summit6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1298 (Fed. Cir. 2015); *Zarinebaf v. Champion Petfoods USA Inc.*, No. 10-cv-6951, 2022 WL 910638, at *12 (N.D. Ill. Mar. 29, 2022) ("[T]he process of analyzing assembled data while using experience to interpret the data is not illicit; an expert need not actively conduct his or her own tests to have a valid methodology."); *see also* Blok T-Mobile Rpt. ¶¶ 61-62, 64, 147, 176-179 (discussing ACG Research report). Mr. Blok also compares other industry studies (e.g., by Deloitte and Cisco) supporting similar cost-saving conclusions and references

T-Mobile's internal data on related expenses.[1] Blok T-Mobile Rpt. ¶¶ 150-165, 197; Blok T-Mobile Dep. at 50:8-16. In contrast to *Sound View Innov., LLC v. Hulu, LLC*, where the expert failed to either review the relied upon study or to tie that study to the accused service (33 F.4th 1326, 1338 (Fed. Cir. 2022)), here Mr. Blok reviewed the full white paper and offered sufficient context and tie to the accused service.[2] Blok T-Mobile Rpt. ¶¶ 61-62, 64, 147, 176-179. Finally, although ACG notes a "Wi-Fi First" trend (ACG Paper at 4), Mr. Blok conservatively applies the per-minute savings only to T-Mobile's observed VoWiFi minutes, aligning with T-Mobile's actual network configuration (whether cellular or Wi-Fi preferred) and lending credibility to his estimate. Blok T-Mobile Rpt. ¶ 136. Even *Sound View* confirms Mr. Blok's analysis would dictate a different result. 33 F. 4th at 1338-39 (distinguishing *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969-970 (9th Cir. 2013), where the expert "gave reasons for his use" of the third-party data and his testimony was admitted).

T-Mobile's reliance on HotSpot@Home proves the point. T-Mobile rebuttal experts argue that legacy offerings like HotSpot@Home constitutes a handover capable alternative (Mot. at 6) is demonstrably false. T-Mobile admits that HotSpot@Home lacked SIP/IMS (Mot. at 2) and, thus, worked only as part of a 2G deployments. Ex. K, TMO-ASPEN-0105944 at 946. T-Mobile was forced to forego its handover capability as part of its "Gan-Lite" 3G deployment in 2010, long before deployment of the now-standard 4G/5G networks. *Id.* Not coincidentally, T-Mobile never saw widespread adoption prior to its introduction of the current, hand-over capable system launched in September 2014. *Id.*; *see* Ex. G at Rog. 15; Ex. L, TMO-ASPEN-0285984 (with Ex. G showing

---

[1] Mr. Minor's Tech Gain-of-Function analysis and subscriber funded infrastructure analysis further confirm that the ACG Research paper provides a conservative estimate of the potential cost savings attributable to VoWiFi. Blok T-Mobile Rpt. ¶¶ 166-175; Ex. E, Blok T-Mobile Dep. at 135:3-11.

[2] In further contrast to *Sound View* (33 F.4th at 1338), here Mr. Blok took the appropriate and necessary step of adjusting the calculated cost savings attributable to the accused service (VoWiFi) and apportioning it to the specific contribution of the '554 Patent using Mr. Minor's apportionment factor. Blok T-Mobile Rpt. ¶¶ 210-21.

5

VoWiFi growing from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in the most recent period). Those historical facts—and not the self-serving and uncorroborated testimony of its long-time employees—confirm that T-Mobile had no non-infringing way to accomplish SIP-based interworking handovers at the time of the hypothetical negotiation for its current VoWiFi offering. Ex. B, Rubin T-Mobile Op. Rpt. ¶¶ 118-122; Ex. C, Rubin T-Mobile Reb. Rpt. ¶¶ 90-92; Blok T-Mobile Rpt. ¶¶ 26, 213.

Here, T-Mobile did not provide its own financial reports detailing or negating its cost-savings associated with VoWiFi (*see* Blok T-Mobile Rpt. ¶ 127); it instead had its witnesses testify that—despite not having analyzed any potential savings—none had occurred. *See* Mot. at 6, 15. Under these circumstances, it is reasonable for an expert to rely on such third-party analyses to arrive at a reliable estimate. *See Atlas Glob. Techs. LLC v. TP-Link Techs. Co.*, No. 2:21-CV-00430-JRG-RSP, 2023 WL 4936210, at *2-4 (E.D. Tex. Aug. 2, 2023); *Estech Sys., Inc. v. Target Corp.*, No. 2:20-CV-00123-JRG-RSP, 2021 WL 5154220, at *10 (E.D. Tex. July 21, 2021) (permitting Mr. Blok to testify regarding third-party survey used to value a functionality). Disagreement with this estimate is not a proper basis for exclusion. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d at 856, *aff'd*, 564 U.S. 91 (2011).

**B.     Mr. Blok Properly Apportioned the Calculated Value of VoWiFi to the Specific Contribution of the '554 Patent.**

It is undisputed that Mr. Blok applied a 30% apportionment factor that reflects Mr. Minor's conclusion that 30%-35% of the economic value of Verizon's VoWiFi service is attributable to the '554 Patent. Blok T-Mobile Rpt. ¶¶ 209-210, 213, 219; *see also* Mot. at 8. This was done for the express purpose of isolating the "benefit of only the patented technology at issue" and to exclude "the benefit of other non-patented elements contributed by T-Mobile." *Id.* ¶ 226. It is, therefore, difficult to ascertain how T-Mobile can then spend the vast majority of its *Daubert* brief claiming that Mr. Blok failed to apportion the incremental value of VoWiFi attributable to the '554 Patent, as its own recitation of the facts confirms this requirement is clearly met. *See* Mot. at 8. T-Mobile simply disagrees with

6

Aspen's factual conclusions regarding what the value is—an issue properly resolved by the jury.

Mr. Blok does not "fail[] to apportion to address the fact that the incremental value of the '554 Patent related to SIP-based handovers," as T-Mobile claims. Mot. at 11. He starts with calculated value of T-Mobile's VoWiFi service to T-Mobile, then apportions it between the patented and non-patented features of the accused system via Mr. Minor's apportionment factor to determine the value the patented method of the '554 Patent conferred on the T-Mobile network. Ex. D, Minor T-Mobile Rpt. ¶¶ 178-218; *see also* Aspen's Resp. to T-Mobile's Motion to Exclude the Opinions of John Minor at § IV.A. This is in direct contrast to the cases T-Mobile cites where ***no apportionment whatsoever*** was applied. *See* Mot. at 11 (citing *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1357 (Fed. Cir. 2022) (excluding damages expert analysis because he "did not attempt to value any efficiencies . . . gained by practicing the patented method compared to non-patented methods")).

While there is no dispute that there can only be infringement when the claimed method is carried out, it is also black letter law that the damages derived from the hypothetical negotiation should be firmly grounded in the "value provided by the patented methods." *TracBeam L.L.C. v. AT&T Inc.*, 2013 WL 6175372, at *5 (E.D. Tex. Nov. 25, 2013) (permitting damages expert to testify that the lack of commercially viable non-infringing alternatives increases the value of the patented method beyond the specific aspect of the accused process it governs). Mr. Blok's application of Mr. Minor's apportionment factor confirms the proper royalty base is used and is firmly tethered to the facts of the case; any alleged caps can be addressed via cross-examination. *Scrum All., Inc. v. Scrum, Inc.*, No. 4:20-CV-227, 2021 WL 1725564, at *3 (E.D. Tex. Apr. 30, 2021).

        1.    ***Mr. Blok does not opine or rely on a theory that the '554 Patent is foundational or use the entire market value of VoWiFi.***

To be clear, Aspen agrees that Mr. Blok did not rely in his report on a theory that the patent is "foundational" or "gating," to VoWiFi. Mot. at 11; Blok T-Mobile Rpt. ¶¶ 201, 208-210. Nor does he

claim it is appropriate to use the entire market value of VoWiFi as the royalty base in his damages calculation. *Id.* Indeed, it is undisputed that other versions of VoWiFi have existed without practicing the '554 Patent. However, it is and has always been Aspen's position that there are no non-infringing alternatives to the '554 Patent that would allow the major cellphone carriers to recognize the value of VoWiFi via a full implementation on their nationwide networks. *See* Ex. B, Rubin T-Mobile Op. Rpt. ¶¶ 118-119; Ex. C, Rubin T-Mobile Reb. Rpt. ¶¶ 90-92; Blok T-Mobile Rpt. ¶¶ 89, 187-199; Ex. E, Blok T-Mobile Dep. at 71:14 – 85:6. While T-Mobile attempts again to point to its predecessor service, Hot Spot@Home (Mot. at 9), that service has no application to the current environment. *See* § IV.A, *supra*. T-Mobile also admits that ▮▮▮ of its Wi-Fi calls today experience a handover (Mot. at 11), demonstrating that the '554 Patent's "use is essential when operating under conditions where the quality levels of employed cellular or Wi-Fi access links tend to fluctuate, and thus potentially inducing communications networking service degradations." Blok T-Mobile Rpt. ¶¶ 26, 186.

T-Mobile's wireless customers—particularly those indoors where obtaining cellular coverage can be difficult, but Wi-Fi availability is common—undoubtedly benefit from the knowledge that they may move freely within their house while maintaining their call whether a handover actually occurs during a given call. As Mr. Blok explains, this is a critical differentiator that T-Mobile publicly touted:

> T-Mobile reported that "Lack of voice coverage or inconsistent voice coverage are top reasons cited for Wi-Fi Calling usage." T-Mobile also found from its studies that over one-third of its customers identified Wi-Fi calling as a critical factor for staying with T-Mobile, instead of switching to another wireless carrier.

Blok T-Mobile Rpt. ¶¶ 188, 190, 192; *see also id*. ¶¶ 187-197; Ex. H, TMO-ASPEN-0000001 at 15; Ex. I, TMO-ASPEN-0000924 at 16; Ex. J, TMO-ASPEN-0001242 at 25; Ex. M, Wi-Fi Calling from T-Mobile.  T-Mobile's website touted this feature within days of launch:

> With ePDG and our nationwide VoLTE (with eSRVCC), customers with a capable smartphone can start a call on VoLTE and hand off to a connected Wi-Fi network or vice versa, or move onto our 4G HSPA+ or 2G network. Y*our call won't drop. You won't even know you've switched between networks.*

Blok T-Mobile Rpt. ¶ 194 (citing Ex. N, T-Mobile Sept. 9, 2014 Blog). This type of evidence in close temporal proximity to the hypothetical negotiation illustrates the tremendous value that the no-drop feature had to the T-Mobile VoWiFi service as a whole.

## 2.  *Mr. Blok appropriately apportions his calculations of the value of VoWiFi using Mr. Minor's calculation of the '554 Patent's contribution to VoWiFi.*

The "hypothetical negotiation" is a well-established framework for calculating a reasonable royalty. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009). That framework is designed "to discern the value of the patented technology" when infringement first began by attempting to estimate the royalty that the parties would have agreed to had they negotiated a license agreement at that time. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012). Because the focus is the value to the parties when infringement begins, "[a] key inquiry in the analysis is what it would have been worth to the defendant, as it saw things at the time, to obtain the authority to use the patented technology, considering the benefits it would expect to receive from using the technology and the alternatives it might have pursued." *Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, 807 F.3d 1283, 1304 (Fed. Cir. 2015). Federal Circuit law dictates a flexible and fact-specific consideration of what the parties would have considered when determining a reasonable royalty. *See Lucent*, 580 F.3d at 1334 (rejecting any "strict requirement [that] could create a hypothetical negotiation far-removed from what parties regularly do during real-world licensing negotiations"); *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys.*, 809 F.3d 1295, 1301-02 (Fed. Cir. 2015).

Various kinds of evidence from the parties may inform the calculation of a reasonable royalty, including "licenses, business prognostications, and information about cost savings or value enhancements compared to alternatives." *Aqua Shield v. Inter Pool Cover Team,* 774 F.3d 766, 771-72 (Fed. Cir. 2014). Consistent with this Court's clear precedent, Mr. Blok's expert opinion relied on evidence "tied to the relevant facts and circumstances of the particular case at issue and the hypothetical

9

negotiations that would have taken place in light of those facts and circumstances at the relevant time." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011).

*First*, Mr. Blok looked at extensive evidence regarding the benefit T-Mobile expected to receive by implementing the infringing technology. Blok T-Mobile Rpt. ¶¶ 148-183, 187-197, 203-211. This includes evidence that the implementation of VoWiFi would result in substantial revenue loss avoidance and cost savings, and evidence that dropped calls were a significant issue for T-Mobile's customers. *Id*. *Second*, Mr. Blok relied on Mr. Rubin's analysis of any alleged non-infringing alternatives and Mr. Minor's technical analysis to determine the contribution of the '554 Patent to this accused service. Blok T-Mobile Rpt. ¶¶ 199, 209. Mr. Blok's analysis thus satisfied the "essential requirement" of a proper damages analysis by ensuring that "the ultimate reasonable royalty award" was based on "the incremental value that the patented invention adds to the end product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

T-Mobile is simply not correct that Mr. Blok's opinions are improper unless they apportion based on the number of calls that do not include an infringing handover. *See* Mot. at 11. The Federal Circuit recently addressed this issue in *Brumfield v. IBG LLC*, stating that "the hypothetical negotiation must turn on the amount the hypothetical infringer would agree to pay to be permitted to engage in the domestic acts constituting 'the infringement.'" 97 F.4th 854, 877 (Fed. Cir. 2024). *Brumfield* (though ruling on foreign conduct) makes clear that no categorical bar exists prohibiting the consideration of non-infringing activities. But, rather, if the patentee seeks to increase that amount by pointing to non-infringing conduct, the patentee must show why that conduct increases the value of the infringement itself "while respecting the apportionment limit that excludes values beyond that of practicing the patent." *Id.* at 876-77. One provided example of a sufficient relationship that permits consideration of non-infringing activities is when the infringing activity "enables and is needed to enable otherwise-

10

unavailable" benefits. *Id.* Here, the ability for calls to handover from the RAN Network to a Wi-Fi connection is needed to enable T-Mobile's customers to confidently use their VoWiFi service without concern for dropped calls, whether a handover occurs during that particular call or not. Ex. B, Rubin Op. T-Mobile Rpt. ¶¶ 118-125, 141-142, 153. This is exactly the benefit that Mr. Minor's "Quality of Service" metric within his apportionment analysis was designed to capture. Ex. D, Minor T-Mobile Rpt. ¶¶ 170-191; Ex. F, Minor T-Mobile Dep. at 122:3-123:3, 231:8-12; 238:2-6.

Other Federal Circuit cases support consideration of similar non-infringing products and activities in the reasonable royalty analysis. In *Apple Inc. v. Motorola, Inc.*, for example, the patent at issue disclosed the use of finger contacts to control a touch screen computer. 757 F.3d 1286, 1294-95 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). Apple's damages expert looked to the non-accused Magic Trackpad, which is used with Apple computers in place of a traditional computer mouse, as a benchmark to value the invention. *Id.* at 1316. The Federal Circuit found that the expert had applied sound methodology and his testimony was admissible. *Id.* at 1318; *see also i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) (rejecting Microsoft's challenge to expert's use of a benchmark for the damages analysis).

Similarly, a price for a hypothetical license may appropriately be based on consideration of the "costs and availability of non-infringing alternatives" and the potential infringer's "cost savings." *Aqua Shield*, 774 F.3d at 771-72; *see also Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1080-81 (Fed. Cir. 1983) ("Reliance upon estimated cost savings from use of the infringing product is a well settled method of determining a reasonable royalty."). In *Prism Techs. LLC v. Sprint Spectrum L.P.*, for example, the patents were directed to methods and systems for managing access to a network. 849 F.3d 1360, 1364 (Fed. Cir. 2017). The patentee's expert testified that, in the absence of a license, Sprint would have attempted to design around the patented invention by building its own private backhaul

network. *Id.* at 1376. This Court rejected Sprint's challenge that this was improper because the patentee did not "invent" backhaul networks and found "the uncontroverted evidence showed that Sprint would have chosen to build its own backhaul network in the absence of a license." *Id.* at 1375-76; *see also Hanson*, 718 F.2d at 1080-82 (approving a reasonable royalty not based on "actual use of the snowmaking machinery" but on what a party would have paid to have the machine available to use).

In all the above cases, the Federal Circuit allowed non-infringing activities to be considered to value infringing activities. Thus, precedent simply calls for a fact-specific hypothetical negotiation analysis focused on valuing the use of the infringing technology. Here, Aspen asserts that there are no commercially viable non-infringing alternatives to the '554 Patent that are available to the major network operators, confirming that Mr. Blok's theory did not capture more than the "'value of what was taken'—the value of the use of the patented technology." *Aqua Shield*, 774 F.3d at 770.

The relationship between calls where an infringing handover occurs and where an infringing handover may need to occur presents exactly the type of situation the Federal Circuit contemplated in *Brumfield*, *Apple* and *i4i*. The ability to perform the claimed method is critical to VoWiFi's successful implementation by the carriers. Ex. B, Rubin Op. T-Mobile Rpt. ¶¶ 118-126; Ex. D, Minor T-Mobile Rpt. ¶¶ 178-181; Blok T-Mobile Rpt. ¶¶ 186. T-Mobile repeatedly claims that only ███ of the Wi-Fi calls on its network involve a handover (Mot. at 2, 11), but noticeably absent is any discussion of what those calls mean for the ██████ on T-Mobile's network that currently use VoWiFi.[3] That impact is significant; poor in-building coverage at home and work were primary drivers of T-Mobile customer churn as of the time of the hypothetical negotiation. Blok T-Mobile Rpt. ¶¶ 187-194. The value of the ability of T-Mobile's system to perform a handover cannot be measured solely by the percentage of

---

[3] The usage rates have grown steadily during the damages period, starting at ████████ ██████ in the most recent reporting period. *See* Ex. G at Rog. 15; Ex. L, TMO-ASPEN-0285984.

12

██████████████████████████

calls where a handover actually occurs. Mr. Minor's apportionment analysis accounts for the impact that handovers have on the quality and performance of T-Mobile's VoWiFi system, which accounts for the fact that not all Wi-Fi calls include a handover. Ex. D, Minor T-Mobile Rpt. ¶ 218.

Because the entire point of the hypothetical negotiation is to capture how the parties would have valued the patented technology at the time of infringement, Mr. Blok's opinion, which relies on Mr. Minor's apportionment analysis, properly applied that methodology and is firmly tethered to the facts of this case. Mr. Blok's testimony applying Mr. Minor's apportionment conclusions should, therefore, be admitted and any gaps go to weight. *See Scrum All., Inc.*, 2021 WL 1725564, at *3.

### C.   Mr. Blok's CapEx/OpEx Based Bargaining Split Is Standard and Record-Tethered.

After apportioning the incremental benefits to the '554 Patent using Mr. Minor's technical apportionment, Mr. Blok next considers how a willing licensor and willing licensee would divide that "apportioned benefit." He uses T-Mobile's actual financials to compute a weighted-average CapEx-to-OpEx ratio of ████ which he opines serves as a reasonable proxy for the relative contribution of technology inputs (licensor) and commercialization/operations (licensee). Blok T-Mobile Rpt. ¶¶ 222-223. As his report explains, the parties would have recognized that this ratio "provides an indication of T-Mobile's costs attributable to acquiring technology in support of its wireless network relative to the costs associated with commercializing and operating this network," thus informing a split of the apportioned benefit consistent with *Georgia-Pacific* factor 13. *Id.*

This is exactly the sort of record-based, case-specific reasoning the Federal Circuit permits, including the use of reasonable proxies and approximations where absolute precision is impossible. *See Aqua Shield*, 774 F.3d at 771; *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014). It is also the opposite of the arbitrary 25% rule rejected in *Uniloc* and *VirnetX* (Mot. at 13), because the split here is derived from T-Mobile's contemporaneous financials and used only to divide

13

███████████████████████████████████████

an already-apportioned benefit. *See VirnetX*, 767 F.3d at 1328; *Uniloc*, 632 F.3d at 1332.[4] Not surprisingly, then, Mr. Blok's methodology has been frequently utilized and accepted by the Court as a fact-tethered data point properly considered as part of *Georgia Pacific* factor 13. *See Headwater,* No. 2:22-CV-00422-JRG-RSP, 2024 WL 4712953, at *6 ("[I]t is within the purview of an expert to opine from the best available evidence rather than perfect evidence. The Court sees no reason to find company-wide valuations for SG&A and R&D cannot inform an expert as to a particular business unit."); *Multimedia Techs. PTE., LTD. v. LG Elecs., Inc.*, No. 2:22-cv-494, Dkt. 312 at 547:11 – 548:19 (E.D. Tex.) (Ex. R) (Mr. Blok testifying regarding a split of the benefit based in part on defendant's company wide average return on investment); *IOEngine, LLC v. Roku Inc.*, No. 6:21-cv-1296, Dkt. 387 at 697:2 – 699:20 (W.D. Tex.) (Ex. S).

Because Mr. Blok's opinions are "grounded in the specific facts of the case"—in particular, the commercial relationship between Aspen and T-Mobile and how T-Mobile invests in or acquires technology in the ordinary course and then commercialize it—they are reliable and admissible. *See Realtime Data LLC v. EchoStar Corp.*, No. 6:17-CV-00084-JDL, 2018 WL 6266301, at *11 (E.D. Tex. Nov. 15, 2018). Exclusion is inappropriate. *See Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-CV-03587-WHO, 2015 WL 1737951, at *12-13 (N.D. Cal. Apr. 8, 2015).

### D.    Reliance on Mr. Minor's "Tech GoF" and Subscriber-Funded Infrastructure Analyses is Limited and Confirmatory.

T-Mobile next seeks exclusion of Mr. Blok's discussion of Mr. Minor's "Tech Gain-of-Function" and "subscriber-funded infrastructure" and his calculations based thereon presented

---

[4] T-Mobile's citation to decisions in *Ericsson, Uniloc*, and *VirnetX* (Mot. at 13) rejecting untethered rules of thumb (i.e., the 25% rule) are inapposite; none of those decisions addressed whether parties may use a fact-grounded, company-specific financial proxy to divide an already-apportioned benefit. In fact, in *IBM Corp.*, the court expressly noted that where—as here—the opinion is based on the parties' financial information it avoids the pitfalls of a "rule of thumb" that *VirnetX* found warrant exclusion. No. 1:22-00590-GBW, Dkt. 538 at 23 (D. Del. Aug. 29, 2024) (Ex. T).

███████████████████████████████████

in paragraphs 163-171 of his report. T-Mobile concedes that Mr. Blok did not use those figures to compute his ███████████ lump sum royalty but rather presented them as reasonableness cross-checks on the plausibility of his primary cost-savings analysis. Mot. at 4. Reasonableness checks are common and helpful to the jury in assessing whether the core damages calculations are within a plausible range. *VirnetX Inc.*, 324 F. Supp. 3d at 857 (permitting damages expert to testify regarding reasonableness check provided by technical expert). They are particularly helpful in the context of patent damages where "[e]stimation of a reasonable royalty by its nature necessarily involves an element of approximation and uncertainty." *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333 (Fed. Cir. 2025) (noting that "[d]istinguishing the gatekeeping role of the judge under Rule 702 from the fact finder's role is particularly essential" in this context as "there may be more than one reliable method for estimating a reasonable royalty").

Aside from its unfounded attack on the underlying models,[5] T-Mobile's only challenge to Mr. Blok's application of them is the uncorroborated, self-serving deposition testimony of two long-time employees. Mot. at 15. Mr. Blok's considered the extensive factual record and concludes differently. *See, e.g.,* Blok Rpt. at Ex. 3.0; *see also id.* at ¶¶ 137-179. This reflects a dispute that should be resolved at trial. *Micro Chem.*, 317 F.3d at 1391-92 ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony.")

## IV.    CONCLUSION

For the foregoing reasons, Aspen respectfully requests that the Court deny T-Mobile's Motion.

---

[5] The admissibility of the underlying models is addressed in Aspen's contemporaneously filed Opposition to T-Mobile's Motion to Exclude the Opinions of John Minor.

████████████████████████████████

Dated: February 4, 2026                    Respectfully Submitted,


By: /s/ Eric H. Findlay
Eric H. Findlay
Texas Bar No.: 00789886
Email: efindlay@findlaycraft.com
T: (903) 534-1100
**FINDLAY CRAFT, P.C.**
7270 Crosswater Avenue, Suite B
Tyler, Texas 75703

Fabio E. Marino (Lead Attorney)*
California Bar No.: 183825
Email: Fabio.Marino@wbd-us.com
T: (408) 720-3436
**WOMBLE BOND DICKINSON (US) LLP**
1279 Oakmead Parkway
Sunnyvale, CA 94085

Steven M. Levitan*
California Bar No.:  148716
Email: Steve.Levitan@wbd-us.com
T: (408) 341-3045
**WOMBLE BOND DICKINSON (US) LLP**
50 California Street, Ste. 2750
San Francisco, CA 94111

Julie C. Giardina*
Maryland Federal Bar No.: 21085
Email: Julie.Giardina@wbd-us.com
T: (410) 545-5802
**WOMBLE BOND DICKINSON (US) LLP**
100 Light St., 26th Floor
Baltimore, MD 21202

Preston H. Heard*
Georgia Bar No.: 476319
Email: Preston.Heard@wbd-us.com
Christine H. Dupriest**
Georgia Bar No. 874494
Email: Christine.Dupriest@wbd-us.com
John G. Perry**
Georgia Bar No.: 141609
Email: John.Perry@wbd-us.com

Jace D. Williams*
Georgia Bar No.: 965608

16

████████████████████████████████████████████████

*Admitted to the Eastern District of Texas
**Admitted Pro Hac Vice

Email: Jace.Williams@wbd-us.com
T: (404) 888-7366
**WOMBLE BOND DICKINSON (US) LLP**
1331 Spring Street, NW, Suite 1400
Atlanta, GA 30309

*ATTORNEYS FOR PLAINTIFF*
*ASPEN NETWORKS, INC.*

17

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on February 4, 2026. Therefore, this document was served on all counsel who are deemed to have consented to electronic service.

By: _Eric H. Findlay_
Eric H. Findlay